UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JENNIFER RUSSO, Plaintiff, -against- STAFFCO OF BROOKLYN, LLC, Defendant. | CV: **JURY TRIAL DEMANDED** |

Plaintiff, JENNIFER RUSSO, by and through her attorneys, SCOTT MICHAEL MISHKIN, P.C., as and for her Complaint against Defendant STAFFCO OF BROOKLYN, LLC, respectfully alleges as follows:

## NATURE OF THE ACTION

FIRST This is an action brought by Plaintiff to redress violations of her rights secured by the Family and Medical Leave Act ("FMLA"), 29 U.S.C.§ 2601 *et seq.;* the New York Labor Law ("NYLL") §§ 740 and 741; and the New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law§ 290 *et seq.,* arising out of unlawful co-employer discrimination, a hostile work environment, and egregious healthcare whistleblower retaliation.

SECOND Plaintiff, a clinical healthcare worker, was subjected to severe and pervasive ongoing harassment, an abusive work environment, and targeted retaliation by supervisors at her clinical workplace.

THIRD When Plaintiff exercised her protected statutory rights by engaging in protected activity pursuant to the FMLA, NYLL§§ 740 and 741, and the NYSHRL, N.Y. Executive Law§ 290 *et seq.,* (NYEL) Defendant knowingly adopted, approved, and formalistically executed the retaliatory animus and adverse actions against her, which included an unjustified suspension, the abrupt cancellation of her healthcare benefits, and the ultimate adverse personnel action of

terminating Plaintiffs employment on April 16, 2026.

## JURISDICTION AND VENUE

FOURTH This Court has federal question jurisdiction over Plaintiffs FML claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 2617(a)(2).

FIFTH This Court has supplemental jurisdiction over Plaintiffs pendent New York State law claims under NYLL §§ 740, 741, and the NYSHRL & NYEL pursuant to 28 U.S.C. § 1367(a), because the state law claims arise out of the exact same common nucleus of operative facts and form part of the same case or controversy.

SIXTH Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(l) and (b)(2), because Defendant conducts substantial business within this judicial district, and a substantial part of the events, acts, and omissions giving rise to the claims occurred at a physical healthcare facility within Suffolk County, New York.

## THE PARTIES

SEVENTH Plaintiff JENNIFER RUSSO is a female resident of the State of New York, residing in Suffolk County, New York. At all relevant times, Plaintiff was an "employee" entitled to the protections of the FMLA, NYLL, NYSHRL and NYEL.

EIGHTH Defendant STAFFCO OF BROOKLYN, LLC ("Defendant StaffCo") is a domestic limited liability company duly organized and existing under the laws of the State of New York, with its principal place of business located at 112 Pacific Street, Brooklyn, New York 11201.

NINTH At all relevant times, Defendant StaffCo was a registered Professional Employer Organization ("PEO") pursuant to New York Labor Law§ 915 *et seq.*

TENTH At all relevant times, Defendant StaffCo acted as an "employer" of Plaintiff within the meaning of 29 U.S.C. § 2611(4)(A), NYLL §§ 740, 741, and NYEL. § 292(5).

**THE PEO CO-EMPLOYMENT RELATIONSHIP AND LIABILITY**

ELEVENTH At all relevant times, Defendant StaffCo maintained a Professional Employer Agreement and a statutory co-employment relationship with Stony Brook Eastern Long Island Hospital (hereinafter "the Hospital enterprise"), a state-operated healthcare facility.

TWELFTH Pursuant to New York Labor Law§ 916(3), Defendant StaffCo acted as the administrative employer of record for the clinical staff utilized by the Hospital enterprise, dynamically sharing employment rights, duties, and operational liabilities.

THIRTEENTH Under the controlling "Economic Realities Test," Defendant StaffCo exercised joint operational and administrative control over the terms and conditions of Plaintiffs employment, specifically managing human resources paperwork, FMLA leave tracking, payroll administration, and the final execution of all formal personnel disciplinary actions.

FOURTEENTH At all relevant times, Defendant StaffCo knew, or in the exercise of reasonable administrative care should have known, that the clinical floor supervisors operating the Hospital enterprise were engaging in a severe campaign of discrimination, a hostile work environment, and unlawful retaliation against Plaintiff following her protected patient-safety disclosures starting in February 2026, and subsequent FMLA leave requests.

FIFTEENTH Rather than fulfilling its independent statutory duties as an employer to protect Plaintiff from discrimination and unlawful retaliation, Defendant StaffCo actively participated in, adopted, and formalistically executed the retaliatory animus generated by

the floor managers, directly finalizing the unjustified suspension and eventual adverse action of the termination of Plaintiffs employment on April 16, 2026.

SIXTEENTH By reason of the foregoing, Defendant StaffCo, as a statutory co-employer under federal and state law, is jointly, severally, and independently liable to Plaintiff for all adverse, retaliatory personnel actions taken against her. Any private contractual allocation of statutory liability or indemnity within the PEO Agreement between Defendant StaffCo and Stony Brook Eastern Long Island Hospital governs only their internal relationship, and cannot alter, diminish, or absolve Defendant StaffCo of its joint statutory obligations to Plaintiff as her employer.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

SEVENTEENTH Plaintiff earned her Master's Degree in Social work in 2015.

EIGHTEENTH Plaintiff received her Licensed Clinical Social Worker ("LCSW") certification in October 2024.

NINETEENTH Plaintiff received her master of Credentialed Alcoholism and Substance Abuse Counselor – Master Level ("CASAC-M") in August 2025.

TWENTIETH Plaintiff's career in Social Work began in July 2015, when she was a Direct Care Apartment Treatment Counselor at The Way Back.

TWENTY-FIRST Plaintiff remained in that position until December 2015, when she left The Way Back to become Health Care Integrator at Little Flower Children & Family Services.

TWENTY-SECOND Upon leaving Little Flower Children & Family Services in September 2017, Plaintiff began working as a Case Manager at Seafield Center and remained in that role until January 2018.

TWENTY-THIRD Plaintiff began her highly dedicated career as a Behavioral Health Social Worker in the Quannacut Rehab Unit ("Unit") at Stony Brook Eastern Long Island Hospital ("SBELIH") on January 16, 2018, reporting directly to SBELIH Social Work Clinical Supervisor, Janet Jackowski ("Jackowski").

TWENTY-FOURTH On July 1, 2019, Plaintiff's employment transitioned into a statutory co-employment arrangement, whereby Plaintiff commenced working under the joint administrative and human resources control of Defendant StaffCo, while SBELIH continuously maintained joint operational control over the terms and conditions of Plaintiff's day-to-day employment.

TWENTY-FIFTH At all relevant times, Plaintiff satisfactorily performed the essential functions of her position in a highly professional manner, consistently meeting or exceeding all legitimate performance expectations of her co-employers.

TWENTY-SIXTH On or around January 18, 2023, Jackowski was promoted to SBELIH's Vice President of Behavioral Health and Social Services, vesting her with ultimate operational and supervisory authority over the Unit and its clinical staff.

TWENTY-SEVENTH On or around January 18, 2023, following Jackowski's promotion, Plaintiff began reporting directly to SBELIH Clinical Social Work Supervisor, Alexander Abramowitz ("Abramowitz").

TWENTY-EIGHTH On January 19, 2023, Plaintiff met with Abramowitz to formally inquire about a vacant detox position within the hospital enterprise that Plaintiff understood to be available but not yet publicly or internally posted.

TWENTY-NINTH During that meeting, Abramowitz informed Plaintiff that Jackowski had already directly awarded the detox position to a newly hired individual, Ashley Price ("Price"),

bypassing standard protocols by failing to post the vacancy or open it up for applications from existing qualified staff.

THIRTIETH On January 23, 2023, a mere four days after inquiring about the detox position, Plaintiff was issued a formal disciplinary action for minor arrival variances on twelve (12) occasions within a three (3) month period, which were directly related to her known and documented disability of ADHD, inattentive type. This sudden and severe disciplinary action was a pretextual and retaliatory response to Plaintiff's protected questioning of Jackowski's irregular administrative placement of newly hired Price into the unposted detox position.

THIRTY-FIRST On or around March 2023, Abramowitz resigned from his position as SBELIH's Clinical Social Work Supervisor.

THIRTY-SECOND On or around March 2023, following Abramowitz's resignation, Plaintiff began reporting directly to Gina Caputo ("Caputo"), who replaced Abramowitz as SBELIH's Clinical Social Work Supervisor.

THIRTY-THIRD On November 19, 2023, Plaintiff and another SBELIH counselor, Reggie Morris ("Morris"), a Black male, attempted to clinically address the inappropriate and disruptive behavior of a Black male patient on the unit. During this necessary clinical interaction, the patient weaponized the situation by falsely stating that he was being targeted because of his race.

THIRTY-FOURTH Immediately following this incident, SBELIH Registered Nurse Quianna (last name unknown) became verbally aggressive, hostile, and intimidating toward Plaintiff on the clinical floor, weaponizing the patient's outburst by falsely accusing Plaintiff of being racist.

THIRTY-FIFTH On November 20, 2023, Plaintiff promptly reported the patient incident and Nurse Quianna's subsequent hostile, unprovoked accusations to her direct supervisor, Caputo, seeking management intervention regarding the abusive conduct.

THIRTY-SIXTH Rather than investigating or addressing Nurse Quianna's workplace aggression, on November 28, 2023, Caputo and Jackowski convened an irregular, mandatory meeting with a highly selective group of SBELIH counselors, specifically arranged to include two Black employees and two White employees, including Plaintiff, regarding race-based behavioral perceptions. Management's selective, high-pressure meeting served to formalize the hostile work environment, constituting a pretextual and retaliatory reframing of the incident that effectively imputed discriminatory animus to Plaintiff without a good-faith investigation.

THIRTY-SEVENTH During the November 28, 2023, meeting, Plaintiff engaged in protected opposition to discrimination by explicitly advising Caputo and Jackowski that the meeting was a direct, retaliatory result of the unverified, defamatory race-based accusations leveled against her by Nurse Quianna and the patient.

THIRTY-EIGHTH In an attempt to evade institutional accountability, Jackowski falsely denied having any prior knowledge of the underlying confrontation or the defamatory accusations, despite having just convened a targeted, racially segregated mandatory meeting based entirely on those events.

THIRTY-NINTH Following the meeting, Plaintiff formalistically escalation her protected complaints regarding the hostile work environment, reporting the ongoing harassment and the retaliatory reframing of the clinical incident via written email notifications to SBELIH Human Resources Officer Cathleen Massaro ("Massaro") on November 30, 2023, December 7, 2023, and December 11, 2023.

FORTIETH In an absolute breakdown of corporate compliance and as a form of direct administrative retaliation, Massaro and HR exhibited deliberate indifference to Plaintiff's formal, written complaints, completely ignoring her disclosures of racial harassment in order to permit the hostile work environment to continue unabated.

FORTY-FIRST Left with no internal recourse due to HR's deliberate indifference, on December 19, 2023, Plaintiff further engaged in protected activity by formally escalating her complaints regarding the hostile work environment and Nurse Quianna's false accusations to an external employee advocacy entity, seeking independent intervention.

FORTY-SECOND Despite Plaintiff's clear and persistent efforts to seek administrative remediation, her escalated external disclosures similarly went uninvestigated and unaddressed, leaving Plaintiff entirely unprotected on the clinical floor.

FORTY-THIRD On January 23, 2024, citing an operational staffing shortage, SBELIH management issued a direct mandate ordering Plaintiff and other unit counselors to report to the detox unit to perform a "constant observation" ("CO") assignment for an hour, despite management's full knowledge that Plaintiff had never received the requisite clinical training or safety protocols necessary to perform a CO task on that specific unit.

FORTY-FOURTH The acute detox patient whom Plaintiff was ordered to observe was highly volatile, medically unstable, and actively hallucinating, specifically shouting that he could see windows being painted black behind him, expressing acute paranoia that the SBELIH staff was conspiring to kill him, and declaring that he needed to escape the facility.

FORTY-FIFTH Due to the patient's severe clinical agitation and management's failure to provide Plaintiff with proper training or security support, the patient physically assaulted Plaintiff during the CO assignment, forcefully pushing Plaintiff's right shoulder in a violent

attempt to bypass her and escape the unit, which necessitated an emergency intervention by floor nurses stationed nearby to restrain the patient back into his room.

FORTY-SIXTH Immediately following this physical assault, Plaintiff contacted Jackowski and the on-duty SBELIH Nursing Supervisor, engaging in protected activity by formally reporting that forcing clinical counselors to perform acute detox CO duties without prerequisite training created an immediate, severe safety risk to Plaintiff, other hospital staff, patients, and the public.

FORTY-SEVENTH As an administrative and operational remedy to mitigate these hazardous conditions, Plaintiff requested that management provide immediate additional support and structured safety protocols for any counselor assigned to CO duties to ensure institutional compliance and physical safety.

FORTY-EIGHTH During this urgent report, Plaintiff explicitly put Jackowski on notice of her physical vulnerability and medical history, reminding her that Plaintiff had previously undergone three (3) complex surgical procedures on her right shoulder directly resulting from a prior physical altercation between patients on the unit, hereby reinforcing that management's untrained CO directives directly exacerbated the risk of re-injury to a known physical impairment.

FORTY-NINTH On February 22, 2024, during a mandatory morning meeting, Plaintiff further engaged in protected advocacy regarding clinical compliance, participating in an institutional discussion concerning the vital need for greater administrative consistency in addressing aggressive patient behavior, adherence to unit safety regulations, and staff responsibility to ensure safe, legally compliant discharge planning even when patients exhibit disrespectful or threatening conduct.

FIFTIETH During the February 22, 2024, meeting, SBELIH staff member Brian Flynn ("Flynn") became verbally aggressive and hostile when the discussion turned to patient safety and clinical conditions. Specifically, when Plaintiff noted that the unit was being treated as "the Medicaid Pit Stop" and "the dumping grounds of the island" and advocated for necessary operational changes, Flynn aggressively retaliated against and suppressed that critique, shouting at Plaintiff to take her act someplace else and to "fucking stop."

FIFTY-FIRST Flynn's hostile outburst and intimidation only ceased when Plaintiff actively intervened and engaged in immediate protected activity by explicitly advising Flynn that she was reporting his abusive behavior to Human Resources.

FIFTY-SECOND Following the meeting, Plaintiff promptly put management on direct institutional notice by informing Caputo and Jackowski of Flynn's aggressive conduct and the hostile environment it created; however, in a continuing pattern of deliberate indifference, management failed to take any corrective action to address Flynn's behavior or safeguard Plaintiff's workplace.

FIFTY-THIRD On February 29, 2024, Plaintiff further formalized her protected opposition by submitting an official institutional safety complaint, SB SAFE 106049, regarding Flynn's hostile behavior. Demonstrating a complete administrative failure by the co-employment enterprise, this safety file was perfunctorily closed eight (8) months later on October 22, 2024, by SBELIH's Vice President of Quality and Regulatory Affairs, Kimberley Mele ("Mele"), with a resolution note dismissively reading: "Reviewed by Employee Health, no follow up required by Employee Health at this time."

FIFTY-FOURTH On April 21, 2024, Plaintiff observed an emergency situation in the unit day room, where two (2) patients were actively yelling and exhibiting severe, escalating physical

and verbal aggression that posed an immediate, dangerous threat to themselves, other patients, and staff in the vicinity.

FIFTY-FIFTH Knowing that her direct supervisor, Caputo, was around the corner in her office with her door open, and that other clinical counselors were positioned in a far corner office, Plaintiff audibly yelled for emergency assistance to de-escalate the volatile situation.

FIFTY-SIXTH When Caputo and the other counselors completely failed to respond or provide necessary operational support, Plaintiff followed established facility safety protocols and pressed the emergency code button to summon critical assistance for the unit.

FIFTY-SEVENTH In a reckless and systemic failure of the facility's safety infrastructure and a continuation of administrative neglect, no staff members responded to Plaintiff's emergency code button activation, nor did the facility issue the required overhead announcement for assistance, leaving Plaintiff entirely isolated and unprotected in a dangerous environment.

FIFTY-EIGHTH Ultimately, an isolated clinical counselor from a different office heard Plaintiff's audibly yelled cries for emergency assistance and arrived to help de-escalate the situation, while a second counselor was forced to activate a separate emergency code to finally secure proper intervention.

FIFTY-NINTH The severe, prolonged delay in responding to Plaintiff's multiple, protocol-compliant attempts to secure emergency assistance constituted an egregious safety breach, directly exacerbating an unmitigated hazard where the aggressive patient behaviors placed the patients, Plaintiff, and others in the immediate vicinity in imminent physical danger.

SIXTIETH In an attempt to evade institutional responsibility and downplay the severity of the incident, Caputo falsely denied hearing the loud commotion, despite her office being located in immediate, close proximity to the day room.

SIXTY-FIRST Rather than initiating an immediate, high-priority administrative investigation into the facility's systemic communication and safety infrastructure failures, Caputo defensively instructed Plaintiff to submit a routine facilities work order to have her specific code button inspected for mechanical functionality.

SIXTY-SECOND Caputo's defensive instruction and the facility's subsequent inaction highlighted a reckless indifference regarding the functionality of SBELIH's emergency notification systems, establishing that the joint-employment enterprise knowingly permitted active physical safety hazards and structural infrastructure failures to go entirely unaddressed.

SIXTY-THIRD On April 23, 2024, due to a severe spike in volatile patient agitation within the unit day room, Plaintiff engaged in further protected activity by sending a written notification via text message to SBELIH Nurse Manager Kenya Cole ("Cole") and Caputo, urgently requesting that a nurse's aide be assigned to the unit to ensure continuous monitoring and safety while the clinical staff attended a mandatory morning meeting.

SIXTY-FOURTH Cole responded that due to ongoing staffing shortages, the facility would not be assigning a nurse's aide to the floor for the entire day, completely disregarding the imminent safety risks raised by Plaintiff.

SIXTY-FIFTH Left without any operational or security support from management and deeply concerned that leaving highly agitated patients completely unattended posed an unacceptable, severe safety risk to the patients, staff, and public, Plaintiff made the necessary clinical and ethical decision to miss the morning meeting to personally supervise the unit and mitigate potential violence.

SIXTY-SIXTH This hazardous incident was part of a persistent, systemic pattern wherein chronic staffing shortages and administrative neglect directly compromised patient, staff, and public safety on the unit.

SIXTY-SEVENTHReflecting the widespread and institutional nature of these unsafe working conditions, on May 7, June 23, and July 1, 2024, Plaintiff received text message communications from Price confirming parallel, ongoing safety issues and a pervasive lack of management support across the clinical floor.

SIXTY-EIGHTH In response to Price's June 23, 2024, text message, Plaintiff disclosed that the workplace environment had become so profoundly dangerous and hostile that she locked herself in her office for most of the day and carried Mace in her pocket out of severe fear for her physical safety on the unit.

SIXTY-NINTH On July 1, 2024, Price informed Plaintiff that she had formally escalated her complaints to HR, providing specific examples of management's deliberate indifference and systematic dismissal of severe workplace safety concerns.

SEVENTIETH During these disclosures, Price also voiced deep concern regarding management and staff's pretextual orchestration and retaliatory action in leveraging unverified, race-based accusations against Plaintiff. Price explicitly noted that this retaliatory action constituted a severe, manufactured threat designed to imperil Plaintiff's professional licensure and career standing.

SEVENTY-FIRST Price explicitly stated to Plaintiff that it was obvious management was actively working against them, turning a blind eye to severe safety hazards while actively perpetuating an unprotected, hostile work environment on the unit.

SEVENTY-SECOND On July 1, 2024, Plaintiff engaged in further formal protected activity by sending an email notification to Jackowski, Caputo, and Cole, once again putting management on direct institutional notice regarding escalating, dangerous patient behaviors, the complete lack of administrative consequences or safety interventions for said behaviors, and how management's inaction had rendered the unit legally severe, abusive, and hostile.

SEVENTY-THIRD On July 16, 2024, a patient designated as Patient J exhibited highly volatile, angry, aggressive, and mentally unstable behaviors on the clinical unit, causing Plaintiff and floor staff to suffer acute, justified concern for their personal physical safety and the safety of all other individuals on the unit.

SEVENTY-FOURTH On July 16, 2024, Plaintiff put management on immediate institutional notice of these severe hazards, requesting that Caputo and Jackowski urgently review the documented clinical entries in Patient J's chart regarding his inappropriate, unstable behaviors and highly hostile interactions with staff.

SEVENTY-FIFTH On July 16, 2024, Plaintiff further advised her supervisors that the unit counselors felt entirely unsafe and unprotected addressing any clinical concerns with Patient J due to his severe unpredictability and the escalating risk of physical violence.

SEVENTY-SIXTHOn July 16, 2024, Plaintiff formalized her protected opposition regarding these unsafe working conditions by sending a comprehensive email notification to the counselors on shift, Caputo, and Cole, in addition to directly speaking with Caputo to demand administrative intervention.

SEVENTY-SEVENTH In a continuous, documented effort to seek remediation for the hostile work environment, Plaintiff repeatedly escalated her protected safety complaints via

email to Jackowski, Caputo, and Cole on July 16, July 21, July 22, and August 1, 2024, all of which went unaddressed by the co-employment enterprise.

SEVENTY-EIGHTH On July 22, 2024, Plaintiff once again verbally reported to Caputo that the severe, unmitigated threat posed by Patient J rendered the clinical unit profoundly unsafe. Plaintiff explicitly disclosed the desperate measures she was forced to take due to management's failure to provide protection, including walking the floor with a pen in her hand for self-defense and remaining confined to her office with the door locked whenever she was not providing direct care.

SEVENTY-NINTH On July 22, 2024, Plaintiff further documented these escalating hazards by sending an email notification detailing her severe safety concerns regarding Patient J to an external employee advocacy entity, seeking independent intervention.

EIGHTIETH In a transparently pretextual administrative maneuver, on July 23, 2024, Caputo directed Plaintiff to attend an immediate meeting with herself and SBELIH

EIGHTY-FIRST During this July 23, 2024 meeting, Plaintiff refused to let management divert attention from the crisis and once again engaged in formal protected activity, reporting the critical safety risks Patient J posed to staff and patients, and urgently requesting that management order an immediate psychiatric evaluation for the unstable individual.

EIGHTY-SECOND Rather than addressing Plaintiff's acute safety disclosures, management utilized the meeting as a pretextual mechanism to execute an adverse retaliatory action, informing Plaintiff that the co-employment enterprise was opening an investigation because Patient J had filed a formal complaint against her regarding an unverified interaction, he claimed to have had on the unit.

EIGHTY-THIRD During the July 23, 2024, meeting, Plaintiff was informed that her clinical interactions were being placed under formal administrative investigation and that her professional colleagues would be interviewed as part of this inquiry. This sudden, adverse administrative action was initiated in direct retaliation for Plaintiff's persistent engagement in protected activity, specifically her formal disclosures regarding systemic public safety violations, acute patient hazards, untrained staff directives, and the co-employment enterprise's failure to maintain a legally compliant and secure clinical environment.

EIGHTY-FOURTH During that same July 23, 2024, meeting, Plaintiff once again engaged in protected activity by reporting that management's ongoing failure to maintain a secure environment rendered the clinical floor so profoundly unsafe that she was forced to walk around with a pen in her hand for personal protection, further noting that other staff and patients had similarly expressed severe fear for their physical safety on the unit.

EIGHTY-FIFTH On August 20, 2024, in direct retaliation for Plaintiff's continued engagement in protected activity, including but not limited to her July 23, 2024, disclosures and her July 29, 2024, formal institutional safety complaint, Jackowski executed a systematic act of administrative harassment and pretextual intimidation, thereby demonstrating a causal connection and a pattern of adverse actions against her in retaliation for her engagement in protected activity as set forth herein. Specifically, Jackowski issued an abrupt, bad-faith email ultimatum threatening that if Plaintiff did not produce a record of completing crisis prevention training by the very next day, August 21, 2024, she would be summarily suspended without pay, an adverse action manufactured solely to penalize Plaintiff for her protected opposition and to suppress further disclosures regarding the unit's unlawful conditions.

EIGHTY-SIXTH Under established SBELIH protocols and operational practices, management is strictly required to provide staff with advance written notice when they are due for specific certifications, particularly because such specialized training sessions are not held on a regular or routine basis; however, in a targeted and retaliatory deviation from institutional policy, management intentionally bypassed these standard protocols to manufacture a bad-faith ultimatum against Plaintiff.

EIGHTY-SEVENTH Had Jackowski's highly irregular and punitive directive been executed, Plaintiff would have been forced to remain out of work for an indefinite period while waiting for the facility to offer the crisis prevention training again, resulting in an adverse loss of compensation and a severe disruption to her employment. This directive constituted retaliatory action motivated with the explicit intent to cause severe harm to Plaintiff's career because of her engagement in protected activity, thereby demonstrating a causal connection and a pattern of material adverse actions designed to penalize her for her protected opposition.

EIGHTY-EIGHTH Plaintiff subsequently confirmed that the training ultimatum Jackowski emailed on August 20, 2024, was entirely incorrect, fabricated, and manufactured as a retaliatory tactic of intimidation; yet management offered no retraction or apology, establishing that this bad-faith administrative maneuver was a pretextual instrument of reprisal deployed specifically to penalize Plaintiff for her engagement in protected activity.

EIGHTY-NINTH Jackowski purposefully and in bad faith misled Plaintiff into believing she was required to complete specialized crisis prevention training in less than twenty-four (24) hours or face an immediate, unpaid suspension when, in fact, no such training session was even scheduled, an adverse administrative action taken in direct retaliation for Plaintiff's prior protected complaints regarding staff, patient, and public safety on the unit.

NINETIETH On August 22, 2024, Plaintiff engaged in further formal protected activity by sending a written notification via email to Jackowski, Caputo, and Cole, regarding dangerously low, freezing temperatures on the unit, explicitly requesting that administration physically walk through the unit to experience the hazardous environmental conditions firsthand.

NINETY-FIRST In her August 22, 2024, email, Plaintiff factually documented that the severe temperature drop had created a freezing environment where multiple vulnerable patients complained of an inability to sleep and staff suffered acute physical discomfort; which factual disclosures described conditions that constituted an improper quality of patient care, a significant risk to the health of the patients, and a substantial and specific danger to public health and safety.

NINETY-SECOND Prior to Plaintiff's formal disclosure, numerous requests had already been submitted to SBELIH's engineering department regarding the hazardous temperatures, establishing that the co-employment enterprise possessed actual prior notice of, and a reasonable opportunity to cure, this persistent, uncorrected facility violation; which systemic failure prompted Plaintiff to formally complain of and oppose the ongoing failure to remediate these hazardous conditions that created a substantial danger to patient health and safety.

NINETY-THIRD On August 28, 2024, Caputo requested that unit counselors submit a written list of ongoing operational issues on the unit via email to prepare for an upcoming staff meeting.

NINETY-FOURTH On August 29, 2024, Plaintiff promptly complied with that supervisory request and engaged in further protected activity by emailing Caputo to formally report that Cole, a Black female, had just subjected Plaintiff to an aggressive verbal assault, screaming at her inside the nursing station in front of multiple professional colleagues and

leveling false, defamatory accusations of misconduct against her in a continuing pattern of workplace hostility and retaliatory intimidation.

NINETY-FIFTH In that same August 29, 2024, email, Plaintiff further engaged in formal protected activity by informing Caputo of a severe, systemic operational divide between unit counselors and the nursing staff, reporting that nursing administration was actively attempting to shift its own clinical responsibilities onto counselors and falsely accusing Plaintiff of failing to perform duties that were strictly the responsibility of the nursing staff.

NINETY-SIXTH Plaintiff also complained to Caputo that this ongoing, manufactured friction made her feel extremely unsafe and uncomfortable in workplace, explicitly reporting that this was part of a persistent pattern of retaliatory intimidation whereby Cole had repeatedly leveled baseless accusations against Plaintiff for actions she did not commit, and explicitly demanding that management formally document and investigate these hostile incidents.

NINETY-SEVENTH In her September 3, 2024, email, Plaintiff once again engaged in protected activity and complained that the unmitigated freezing temperatures continued to impair patient health, reporting that multiple vulnerable patients remained unable to sleep and that both patients and clinical staff were suffering severe physical distress due to the persistent environmental hazard.

NINETY-EIGHTH Despite these repetitive, formal workplace safety danger complaints to the facility's engineering department, Jackowski, Caputo, and Cole, the co-employment enterprise failed to take any corrective action, demonstrating a deliberate indifference and a persistent, uncorrected facility violation that sustained a substantial danger to patient health and employee safety.

NINETY-NINTH On September 5, 2024, during a mandatory morning meeting, Plaintiff engaged in formal protected activity by reporting systemic clinical inconsistencies and protocol violations committed by medical staff that deviated from established unit expectations, thereby creating a substantial and specific danger to public health and safety.

ONE HUNDREDTH As a primary factual example of this improper quality of patient care, Plaintiff disclosed that an active rehabilitation patient, who was visibly under the influence and had tested positive for fentanyl, was deliberately granted unrestricted access to his personal cellular device by SBELIH Medical Director Dr. Lloyd Simon ("Simon"), in direct violation of strict facility safety regulations designed to prevent patients from contacting outside sources to procure illegal contraband.

ONE HUNDRED FIRST Plaintiff explicitly reported to management that Simon's reckless disregard for established safety protocols created an immediate, severe hazard that not only compromised the clinical rehabilitation and physical safety of the intoxicated patient, but also actively endangered the lives and physical safety of the staff, other vulnerable patients, and visitors on the unit.in the rehab unit are not permitted to have access to their personal cell phones as to avoid contacting the outside to request contraband.

ONE HUNDRED SECOND During that same September 5, 2024, meeting, Plaintiff further engaged in formal protected activity by raising critical clinical concerns regarding Simon's apparent cognitive impairment, explicitly documenting his persistent inability to remember basic operational routines, such as where to execute mandatory medical and administrative paperwork and detailing the direct, adverse impact Simon's diminished cognitive function had on institutional decision-making and the baseline standard of patient care

ONE HUNDRED THIRD During the September 5, 2024, meeting, Plaintiff further voiced her concerns with Simon's cognitive function and the effect it has on his decision making and patient care due to Simon's inability to remember simple things such as where he is to sign paperwork.

ONE HUNDRED FOURTH On October 8, 2024, at the direct request of a group counselor, Plaintiff attempted to conduct a necessary clinical intervention with a patient designated as Patient M to address the patient's continuous refusal to participate in mandatory therapeutic group sessions.

ONE HUNDRED FIFTH During this clinical interaction, Patient M became highly volatile, combative, and aggressive, shouting and screaming at Plaintiff. Despite utilizing established de-escalation protocols, Plaintiff was unable to safely redirect the patient due to Patient M's severe behavioral escalation and the lack of immediate administrative or security support on the floor.

ONE HUNDRED SIXTH Following this hostile encounter, on October 8, 2024, Plaintiff engaged in formal protected activity by sending a written text disclosure to her direct supervisor, Caputo, concerning the unsafe clinical conditions and explicitly challenging management's ongoing failure to maintain a secure workplace, protect staff from patient aggression, or enforce institutional unit compliance rules.

ONE HUNDRED SEVENTH In that same October 8, 2024, disclosure, which constituted direct advocacy for patient and public safety, Plaintiff further engaged in formal protected activity by reporting a critical operational and confidentiality breach, notifying Caputo that Patient M was being permitted to routinely leave the locked unit unescorted to meet with counselor Price, in direct violation of mandatory patient privacy regulations, strict facility security protocols, and statutory healthcare standards.

ONE HUNDRED EIGHTH The systematic failure of Patient M and counselor Price to adhere to established facility protocols and unit safety policies created an unmitigated hazard, placing the patients themselves in harm's way while actively jeopardizing the physical safety of Plaintiff and everyone else on the unit

ONE HUNDRED NINTH In her October 8, 2024, written text disclosure to Caputo, Plaintiff engaged in further formal protected activity by reporting a critical operational and confidentiality breach, challenging why Patient M was routinely permitted to leave the locked unit unescorted to meet with counselor Price, in direct violation of mandatory patient privacy regulations and facility security protocols.

ONE HUNDRED TENTH On October 9, 2024, Patient M subjected Plaintiff to another severe, volatile confrontation in the hallway, exhibiting loud, aggressive, and mentally unstable behaviors that placed Plaintiff in immediate apprehension of physical harm. Following established emergency protocols, Plaintiff removed herself from the incident to active the emergency code button inside her office to summon urgent assistance.

ONE HUNDRED ELEVENTH In a reckless failure of the facility's emergency infrastructure and a continuing pattern of deliberate indifference to staff safety, no staff or security personnel responded to Plaintiff's localized emergency code activation; instead, response personnel were improperly diverted to an unrelated matter involving a patient in the hallway, leaving Plaintiff completely isolated, trapped, and unprotected during an active crisis.

ONE HUNDRED TWELFTH Alone in her office, profoundly shaken and fearing for her physical safety due to management's failure to maintain a secure environment, Plaintiff immediately engaged in further formal protected activity by contacting Human Resources and making an urgent disclosure to HR representative Lindsey regarding the hostile work

environment, the immediate physical threats she faced, and the catastrophic failure of the facility's emergency response systems.

ONE HUNDRED THIRTEENTH During this formal disclosure, Plaintiff explicitly reported to Lindsey the systematic lack of operational safety and supervisory support from management, while concurrently objecting to the co-employment enterprise's historic and ongoing failure to investigate, address, or remediate any of the formal complaints and safety disclosures she had previously escalated to Human Resources.

ONE HUNDRED FOURTEENTH Demonstrating management's actual knowledge of the immediate hazard, Caputo entered a formal notation in Patient M's clinical chart explicitly documenting that Plaintiff was forced to leave the clinical situation out of a justified concern for her personal physical safety.

ONE HUNDRED FIFTEENTH Despite Caputo's own written entry in Patient M's chart acknowledging Plaintiff's safety crisis, and notwithstanding the electronic records of the October 9, 2024, emergency code button activation regarding this exact same incident, not a single representative of management or security checked on Plaintiff's physical well-being or offered operational support.

ONE HUNDRED SIXTEENTH On October 9, 2024, following the incident, Plaintiff engaged in further formal protected activity by sending a written text disclosure to Caputo, explicitly objecting to management's failure to maintain a secure environment and challenging how no one in administration had reached out to support her after she was subjected to hostile, aggressive behavior by an unstable patient two days in a row.

ONE HUNDRED SEVENTEENTH In a continuation of administrative neglect and deliberate indifference, Plaintiff did not receive any response or remediation from Caputo regarding this written disclosure.

ONE HUNDRED EIGHTEENTH On October 10, 2024, Jackowski, Caputo and Cole attended the morning staff meeting.

ONE HUNDRED NINETEENTH Because the joint presence of these upper-level administrative managers at a routine morning meeting deviated completely from standard operational norms, Plaintiff utilized this irregular gathering to engage in further high-priority protected activity, directly confronting the management team to verbally re-escalate her severe objections regarding the unaddressed patient violence, the systemic failures of the facility's safety infrastructure, and the ongoing hostile work environment against her.

ONE HUNDRED TWENTIETH During the October 10, 2024, meeting, Plaintiff engaged in formal protected activity by explicitly notifying Jackowski, Caputo, and Cole that the prior day, October 9, 2024, marked the second documented instance wherein she activated her localized emergency code button for critical support and received absolutely no administrative or security response from the facility.

ONE HUNDRED TWENTY-FIRST Plaintiff further engaged in formal protected activity by objecting to management's systematic lack of operational support, inadequate safety protocols, and the complete absence of clinical consistency and administrative structure on the unit, factually reporting that these institutional failures directly created an improper quality of patient care and sustained a substantial and specific danger to both employee and patient safety.

ONE HUNDRED TWENTY-SECOND While Plaintiff acknowledged that negative patient behaviors are inherently expected within an acute behavioral health environment, she maintained

her protected advocacy by advising administration that the mandatory clinical course of action required to mitigate these known hazards was the implementation of strict institutional consistency and structured compliance protocols.

ONE HUNDRED TWENTY-THIRD In that same meeting, Plaintiff engaged in explicit protected activity under the NYSHRL by formally challenging management's prior retaliatory action regarding Nurse Quianna, directly objecting to how management had perfunctorily refused to address Quianna's unprovoked, intimidating, and aggressive behaviors toward Plaintiff and had instead utilized a pretextual and retaliatory reframing of the incident to falsely impute racist animus to Plaintiff.

ONE HUNDRED TWENTY-FOURTH As Plaintiff was exiting the meeting room, Jackowski aggressively pursued and cornered Plaintiff on the public unit day room floor.

ONE HUNDRED TWENTY-FIFTH Recognizing an immediate threat of administrative ambush and hostile escalation, Plaintiff explicitly advised Jackowski that she did not feel physically or professionally secure speaking to her alone and exercised her right to request that any further discussions be held strictly with an employee advocate and Human Resources present.

ONE HUNDRED TWENTY-SIXTH As Plaintiff attempted to retreat to her office and was unlocking her door, Jackowski directly blocked and intercepted her, stating in a highly hostile, intimidating, and coercive tone: "We're going to settle this now."

ONE HUNDRED TWENTY-SEVENTH Left with no recourse due to this open workplace aggression, Plaintiff immediately headed toward the administrative offices to seek emergency intervention from Human Resources; however, in a desperate attempt to manipulate the narrative

and execute a preemptive strike, Jackowski aggressively trailed Plaintiff, physically running past her to gain access to HR first.

ONE HUNDRED TWENTY-EIGHTH Upon rushing into the administrative suite, Jackowski began loudly shouting and screaming at the Human Resources staff, declaring that Plaintiff had created an immediate "HR issue" in a bad-faith effort to distort the facts and initiate a preemptive disciplinary action.

ONE HUNDRED TWENTY-NINTH SBELIH Assistant Director of Human Resources, Laura Merin ("Merin"), emerged from a nearby office, at which point Plaintiff immediately engaged in formal protected activity by requesting an opportunity to speak with Merin privately and formalize a hostile work environment report before Jackowski could further manipulate the narrative.

ONE HUNDRED THIRTIETH This hostile intervention marked the second documented instance wherein Jackowski aggressively disrupted, intercepted, and blocked Plaintiff's attempts to secure administrative protection from Human Resources, specifically targeting Plaintiff due to her engagement in protected and ongoing complaints of safety issues in the workplace, and acting to punish her for disclosures under the protections of NYLL §§ 740 and 741.

ONE HUNDRED THIRTY-FIRST On October 10, 2024, at approximately 9:22 A.M., Plaintiff generated an immediate, contemporaneous written record of this hostile workplace environment by sending a text disclosure to an external employee advocate, Dominique Roberts ("Roberts"), urgently requesting an immediate phone call because Jackowski had aggressively chased and cornered Plaintiff in direct retaliation for Plaintiff raising patient safety and public health hazards during the morning staff meeting.

ONE HUNDRED THIRTY-SECOND On October 11, 2024, Plaintiff generated a further contemporaneous written record of the ongoing hostility against her, by sending an email disclosure to Roberts regarding the systematic intimidation executed by Jackowski the previous day and further confirming that her external and internal escalations regarding the severity of the unlawful working conditions had gone unaddressed while the environment continued to deteriorate.

ONE HUNDRED THIRTY-THIRD In that same October 11, 2024, disclosure, Plaintiff re-escalated her formal objections regarding management's ongoing failure to maintain institutional consistency, the complete absence of supervisory support when she activated her localized emergency safety codes, and management's actual knowledge of volatile patient behaviors, concluding that administration's refusal to act directly sustained an improper quality of patient care and an unmitigated, substantial danger to the safety of staff, patients, and visitors.

ONE HUNDRED THIRTY-FOURTH On October 16, 2024, a mere six (6) days after her last engagement in protected activity where she was advocating for workplace safety, patient care standards, and the mitigation of public health hazards during the morning staff meeting, the co-employment enterprise executed a severe adverse employment action by issuing Plaintiff her first formal Corrective Action/Written Warning ("Written Warning") for alleged disrespectful or inappropriate interactions with patients and partners, and an alleged failure to uphold "ICARE" values.

ONE HUNDRED THIRTY-FIFTH The manufactured incidents pretextually deployed within the October 16, 2024, Written Warning exclusively targeted the severe patient safety crises that occurred on October 8, and October 9, 2024, the exact incidents where Plaintiff had engaged in protected activity by utilizing established emergency protocols and reporting

management's dangerous operational failures, thereby demonstrating a clear causal connection and a pretextual reframing designed to mask unlawful retaliation.

ONE HUNDRED THIRTY-SIXTH The October 16, 2024, Written Warning further asserted that Plaintiff allegedly "berated" Jackowski, Caputo, and Cole when she verbally disclosed her safety concerns during the irregular October 10, 2024, morning staff meeting, thereby explicitly confirming that management treated Plaintiff's protected oral disclosures and advocacy for patient safety as a disciplinary offense.

ONE HUNDRED THIRTY-SEVENTH The October 16, 2024, Written Warning also stated that a patient had submitted a formal complaint regarding Plaintiff's treatment towards her, a claim that was perfunctorily accepted by the co-employment enterprise without an objective or good-faith investigation into the underlying clinical crisis, thereby further demonstrating a calculated pattern of administrative retaliation against Plaintiff for her engagement in protected activity regarding ongoing systemic patient and staff safety issues.

ONE HUNDRED THIRTY-EIGHTH The October 16, 2024, Written Warning noted that this constituted the second formal patient complaint made against Plaintiff, explicitly referencing the previous July 2024, incident, the exact event where management had utilized a pretextual mechanism to execute an adverse retaliatory investigation immediately after Plaintiff demanded an urgent psychiatric evaluation for an unstable patient, thereby demonstrating a continuing pattern of administrative retaliation against Plaintiff for her protected advocacy regarding patient safety.

ONE HUNDRED THIRTY-NINTH Finally, the October 16, 2024, Written Warning asserted the bad-faith administrative conclusion that, following an investigation, Plaintiff had allegedly violated the Code of Conduct and failed to uphold the "ICARE" values of compassion,

accountability, respect, and excellence; which findings were entirely false, fabricated, and manufactured as a pretextual mechanism designed to mask unlawful retaliation and to penalize Plaintiff for her persistent engagement in protected activity, despite the fact that Plaintiff had satisfactorily performed her duties and never committed any policy or regulatory violations.

ONE HUNDRED FORTIETH On October 16, 2024, during the disciplinary meeting regarding the retaliatory Written Warning, HR Assistant Director Merin engaged in further administrative bad faith by dismissively asserting that Plaintiff's prior protected disclosures regarding Jackowski's aggressive, hostile behavior were untruthful, thereby demonstrating a coordinated corporate effort to suppress Plaintiff's reports, shield a high-level supervisor, and establish a false pretextual narrative to mask unlawful retaliation.

ONE HUNDRED FORTY-FIRST The issuing of the October 16, 2024, Written Warning was executed in direct retaliation for Plaintiff's engagement in protected activity, specifically her verbal disclosures and advocacy regarding ongoing systemic safety hazards and public health concerns during the October 10, 2024, morning staff meeting, thereby further demonstrating a causal connection and a pattern of material adverse actions.

ONE HUNDRED FORTY-SECOND Immediately following receipt of the retaliatory Written Warning, Plaintiff formally demanded that the co-employment enterprise conduct an independent administrative review, view and permanently preserve critical unit video surveillance recordings, and secure intervention from an external employee advocacy entity to remedy the unlawful discipline.

ONE HUNDRED FORTY-THIRD Reflecting a severe breakdown in corporate compliance and institutional bad faith, the co-employment enterprise perfunctorily refused to

provide independent administrative remediation, failed to review or preserve the exculpatory surveillance evidence, and permitted the retaliatory discipline to stand uncorrected.

ONE HUNDRED FORTY-FOURTH On October 17, 2024, Plaintiff engaged in further formal protected activity by filing an official institutional safety complaint, SB SAFE 114457, detailing the hostile workplace environment and Jackowski's aggressive administrative ambush following the October 10, 2024, meeting.

ONE HUNDRED FORTY-FIFTH Demonstrating a continuing pattern of deliberate indifference and direct administrative retaliation, the co-employment enterprise delayed any review of the crisis for nearly a year until September 16, 2025, when Mele perfunctorily closed the safety file with a dismissive Resolution Note revealing that upper-level administration took zero meaningful corrective action regarding Jackowski's unlawful conduct, acting instead to punish and penalize Plaintiff for her persistent protected activity, compliance disclosures and for her being accused of being racist.

ONE HUNDRED FORTY-SIXTH On October 17, 2024, Plaintiff engaged in further formal protected activity by sending a comprehensive written disclosure via email to Lindsay, Merin, and external employee advocates regarding Jackowski's hostile, retaliatory behavior and administrative ambush on October 10, 2024.

ONE HUNDRED FORTY-SEVENTH In a continuing pattern of administrative neglect and deliberate indifference to formal reports of a hostile work environment, unlawful retaliation, and statutory healthcare safety violations, Plaintiff received no response or remediation from HR administration regarding her October 17, 2024, disclosure.

ONE HUNDRED FORTY-EIGHTH On November 7, 2024, Plaintiff sent a formal written notification to an external employee advocate, re-escalating her objections to the

unlawful working conditions and demanding an immediate administrative challenge to the retaliatory October 16, 2024, Written Warning.

ONE HUNDRED FORTY-NINTH In that same November 7, 2024, disclosure, Plaintiff reported that an objective third-party witness, SBELIH counselor John Catherine Grey ("Grey"), had independently approached management to report Jackowski's threatening, volatile, and intimidating conduct toward Plaintiff during the October 10, 2024, incident. Plaintiff further documented that Jackowski's aggressive behavior was so extreme that it had actively frightened Grey and triggered severe psychological distress in an objective bystander on the unit day room floor.

ONE HUNDRED FIFTIETH On November 7, 2024, Plaintiff generated a formal written record documenting that multiple objective staff witnesses observed Jackowski's aggressive assault on October 10, 2024, and explicitly notified management that the names of all eye-witness staff members present were preserved on the facility's official daily morning report log.

ONE HUNDRED FIFTY-FIRST In that same November 7, 2024, disclosure, Plaintiff documented that she had explicitly notified her supervisor, Caputo, that Jackowski's ongoing, unmitigated hostility had directly caused her to suffer severe psychological trauma, forcing her to return to intensive, full-time clinical therapy to treat severe mental health wounds and traumatic memories that had been violently re-opened by Jackowski's workplace conduct, thereby putting the co-employment enterprise on direct notice of the profound physical and psychological injury being inflicted upon Plaintiff by its supervisors.

ONE HUNDRED FIFTY-SECOND Plaintiff further documented that despite providing explicit notice of this severe medical and psychological distress to her supervisor, Caputo exhibited deliberate indifference and institutional bad faith, perfunctorily refusing to offer any

administrative support, safety interventions, or operational remediation, thereby actively permitting the hostile and retaliatory work environment to continue unabated despite actual notice of the ongoing harm.

ONE HUNDRED FIFTY-THIRD On November 7, 2024, the exact same day Plaintiff submitted her comprehensive written disclosures exposing these systemic safety hazards, statutory non-compliance, and supervisor abuse in retaliation of her workplace safety violations, the co-employment enterprise executed a severe, materially adverse employment action by issuing Plaintiff a Corrective Action Final Written Warning ("Final Warning") alongside an immediate three-day unpaid suspension for alleged disrespectful or inappropriate interactions with patients, partners, volunteers, and others, and an alleged failure to uphold "ICARE" values.

ONE HUNDRED FIFTY-FOURTH The co-employment enterprise unlawfully leveraged and pretextually reframed a benign text message that Plaintiff had previously sent within an informal, private group chat with coworkers on October 24, 2024, to serve as the manufactured basis for the retaliatory Final Warning and suspension.

ONE HUNDRED FIFTY-FIFTH Within the private group chat in question, Plaintiff had merely utilized lighthearted, sarcastic humor regarding widely known workplace operational issues on the unit involving management and a physician; which harmless communication did not violate any facility policies, yet was intentionally pretextually deployed by the enterprise as an administrative mechanism to mask unlawful retaliation and execute a severe adverse employment action against Plaintiff in direct retaliation for her patient safety disclosures and her formal opposition to race-based discrimination, a hostile work environment, and retaliatory harassment.

ONE HUNDRED FIFTY-SIXTH On November 7, 2024, the exact same day Plaintiff submitted her comprehensive written disclosures exposing these systemic workplace safety dangers, statutory non-compliance, retaliatory harassment, and a hostile work environment, the co-employment enterprise executed a severe, materially adverse employment action by issuing Plaintiff a Corrective Action Final Written Warning ("Final Warning") alongside an immediate three-day unpaid suspension for alleged disrespectful or inappropriate interactions with patients, partners, volunteers, and others, and an alleged failure to uphold "ICARE" values.

ONE HUNDRED FIFTY-SEVENTH The co-employment enterprise unlawfully leveraged and pretextually reframed a benign text message that Plaintiff had previously sent within an informal, private group chat with coworkers on October 24, 2024, to serve as the manufactured basis for this adverse action (retaliatory) Final Warning and suspension.

ONE HUNDRED FIFTY-EIGHTH To ensure absolute professional transparency and preempt any bad-faith administrative distortions of the private communication, Plaintiff proactively sent an email notification to management and Human Resources to clarify the benign context of the message, reiterate her baseline commitment to clinical standards, and professionally address the internal unit dynamics.

ONE HUNDRED FIFTY-NINTH The co-employment enterprise asserted that the severity of the November 7, 2024, Final Warning and suspension was based upon Plaintiff having received the prior Written Warning on October 16, 2024, less than one month prior, thereby attempting to manufacture a fraudulent paper trail of progressive discipline as a pretext to terminate Plaintiff due to her patient safety disclosures, compliance activity, and formal opposition to race-based discrimination and a hostile work environment.

ONE HUNDRED SIXTIETH During the meeting, Plaintiff immediately engaged in formal protected activity by orally challenging Merin regarding how the severity of the November 7, 2024, Final Warning could legally be predicated on the October 16, 2024, Written Warning, given that Plaintiff had already formally contested the October 16 discipline as a retaliatory action and had submitted a pending request for an independent administrative appeal.

ONE HUNDRED SIXTY-FIRST In a clear demonstration of institutional bad faith and an inability to legally justify the disciplinary action, Merin failed to provide any response, explanation, or remediation to Plaintiff's challenge, confirming that the adverse progressive discipline framework was an unbacked, pretextual mechanism deployed in direct retaliation for Plaintiff's engagement in protected activity.

ONE HUNDRED SIXTY-SECOND On November 19, 2024, Plaintiff generated a further contemporaneous written record of her protected opposition by submitting a formal email notification to external employee advocates, re-escalating her challenges to both the October 16, 2024, Written Warning and the November 7, 2024, Final Warning, and demanding a full administrative review to reverse the unlawful discipline.

ONE HUNDRED SIXTY-THIRD In her November 19, 2024, written disclosure, Plaintiff engaged in further formal protected activity by reporting a discriminatory and operational practice, explicitly challenging the unlawful retaliation and disparate treatment after learning that Jackowski had summarily bypassed internal promotional protocols to award a desired position to Price, a recently hired employee.

ONE HUNDRED SIXTY-FOURTH In that same November 19, 2024, disclosure, Plaintiff re-escalated her protected opposition regarding the persistent lack of security, administrative support, and operational structure on the unit, documenting how these systemic

failures directly created an improper quality of patient care, while concurrently objecting to the conduct of Jackowski and Merin, which constituted a persistent, bad-faith concealment of operational hazards and represented an ongoing, affirmative defiance of mandatory public health and patient safety regulations, thereby creating a clear, substantial, and specific danger to public health and patient safety.

ONE HUNDRED SIXTY-FIFTH On November 21, 2024, Plaintiff attended a formalized administrative appeal hearing with Merin and external employee advocates to demand the immediate review and reversal of the retaliatory November 7, 2024, Final Warning and unpaid suspension.

ONE HUNDRED SIXTY-SIXTH During this November 21, 2024, compliance meeting, Plaintiff engaged in explicit protected activity under Title VII, the NYSHRL, and NYLL §§ 740/741 by directly confronting HR regarding the fact that her multiple, formal SB SAFE institutional safety disclosures had been completely ignored and asserting that the co-employment enterprise was actively targeting and retaliating against her precisely because she voiced severe public safety hazards and filed official regulatory.

ONE HUNDRED SIXTY-SEVENTH As a direct result of the November 21, 2024, administrative appeal hearing, the co-employment enterprise was forced to partially retreat from its unsupported discipline, reducing Plaintiff's three-day unpaid suspension to a one-day suspension.

ONE HUNDRED SIXTY-EIGHTH On December 5, 2024, the co-employment enterprise presented Plaintiff with a coercive administrative release and waiver agreement, which management required her to execute as a mandatory condition to receive the back-pay compensation for the two days of withheld wages that were rightfully owed to her.

ONE HUNDRED SIXTY-NINTHBecause this administrative release was textually designed as a retaliatory instrument to force Plaintiff to waive her statutory rights and abandon her pending legal challenges to the discriminatory October 16, 2024, Written Warning, Plaintiff professionally declined to execute the waiver.

ONE HUNDRED SEVENTIETH Plaintiff concurrently submitted a formal written objection challenging how the severity of the November 7, 2024, discipline could legally remain predicated on the manufactured October 16, 2024, Written Warning when the underlying validity of that prior warning was still actively under formal administrative dispute; explicitly contesting management's bad-faith effort to compel a settlement of the secondary discipline before the initial retaliatory warning had been objectively reviewed or resolved.

ONE HUNDRED SEVENTY-FIRST Reflecting a severe, systematic breakdown in corporate compliance and institutional bad faith, the co-employment enterprise perfunctorily refused to provide an objective review, completely failing to investigate or resolve Plaintiff's formal administrative challenges to the discriminatory October 16, 2024, Written Warning.

ONE HUNDRED SEVENTY-SECOND Plaintiff subsequently sent a formal email disclosure to Merin, explicitly demanding that the revised administrative documentation be processed immediately so that her two days of back pay could be restored; however, demonstrating a continuing pattern of deliberate indifference and retaliatory animus, Merin and the enterprise's administration offered absolutely no response and refused to remit her wages.

ONE HUNDRED SEVENTY-THIRD Plaintiff followed up by emailing Merin to request that the necessary administrative paperwork be prepared so that the final revised documentation could be executed and the compensation for her two restored days of pay could be remitted;

however, demonstrating ongoing bad faith, HR administration offered absolutely no response to this demand.

ONE HUNDRED SEVENTY-FOURTH In December 2024, Plaintiff was forced to take a protected medical leave of absence under the FMLA to undergo necessary hand surgery, remaining out on qualified medical leave until she returned to active duty in March 2025.

ONE HUNDRED SEVENTY-FIFTH While Plaintiff was out on her protected FMLA leave of absence, the co-employment enterprise engaged in further adverse administrative maneuvers by adding Francis (Frank) Chapman ("Chapman") as an additional Clinical Social Work Supervisor within the rehabilitation unit, a structural change implemented to dilute Plaintiff's operational authority and intensify administrative surveillance over her position upon her return.

ONE HUNDRED SEVENTY-SIXTH On April 8, 2025, immediately following her return from protected medical leave, Plaintiff learned that an acute rehabilitation patient had suffered a severe fall and struck his head inside his hospital room the previous day—a catastrophic incident resulting directly from the unit's ongoing operational deficiencies and staffing non-compliance, which systemic failures legally constituted an improper quality of patient care and an unmitigated substantial and specific danger to public health and safety regarding which Plaintiff had continuously engaged in protected activity and advocacy for patient safety within the hospital facility.

ONE HUNDRED SEVENTY-SEVENTH On April 20, 2025, Plaintiff informed Caputo and Chapman that a patient was given the incorrect medication by nursing, causing patient to go into precipitated withdrawal. Plaintiff advised Caputo and Chapman that the patient expressed severe safety concerns, did not feel clinically supported, felt disrespected by unit staff,

and was demanding an immediate discharge from SBELIH against medical advice to seek care at an alternative hospital facility that maintained compliant standard protocols and respected patient welfare.

ONE HUNDRED SEVENTY-EIGHTH Caputo and Chapman informed Plaintiff that they were entirely unaware of the underlying clinical breakdown that had transpired with the patient or the severe institutional safety concerns she had raised.

ONE HUNDRED SEVENTY-NINTH On May 7, 2025, Plaintiff engaged in further formal protected activity by submitting a comprehensive written disclosure via email to upper-level external employee advocacy and compliance executives, including Andria Saunders ("Saunders") and George Gresham ("Gresham"), urgently requesting executive intervention regarding the severe, ongoing adverse treatment and retaliation she was experiencing from management, specifically documenting unlawful retaliation, systemic discrimination, targeted harassment, and the physical administrative ambush executed by Jackowski.

ONE HUNDRED EIGHTIETH In that same May 7, 2025, disclosure, Plaintiff further documented that she had repeatedly attempted to secure administrative protection from regional compliance representatives, including Roberts and Morris, but that those compliance contacts had exhibited deliberate indifference to her disclosures, leaving several of her urgent emails and phone calls completely unanswered.

ONE HUNDRED EIGHTY-FIRST Plaintiff informed Saunders that the hostile workplace environment, the severe retaliatory harassment, and the systemic lack of operational support from administrative oversight channels had been profoundly distressing, destructive, and damaging to her mental health, violently exacerbating her ongoing psychological injuries.

ONE HUNDRED EIGHTY-SECOND Plaintiff requested that Gresham contact her at his earliest convenience to address the ongoing statutory safety workplace hazards on the unit. requested

ONE HUNDRED EIGHTY-THIRD On May 7, 2025, immediately following Plaintiff's formal email escalation, Saunders responded in writing, thanking Plaintiff for reaching out and validating her courage in disclosing what Saunders explicitly acknowledged sounded like an incredibly difficult and distressing experience.

ONE HUNDRED EIGHTY-FOURTH In that same May 7, 2025, communication, Saunders formally acknowledged receipt of Plaintiff's protected disclosures and explicitly confirmed that the severe operational and retaliatory issues raised by Plaintiff were being taken seriously by executive administration.

ONE HUNDRED EIGHTY-FIFTH Saunders further informed Plaintiff that she would personally ensure that Plaintiff's compliance concerns were promptly reviewed, and that her executive request to speak directly with Gresham was being formally communicated up the chain of administrative command.

ONE HUNDRED EIGHTY-SIXTH Finally, Saunders advised Plaintiff that she would follow up with the appropriate regional compliance leadership to guarantee that an administrative representative connected with Plaintiff directly to investigate and remediate the severe workplace and statutory issues she had disclosed.

ONE HUNDRED EIGHTY-SEVENTH On May 19, 2025, Plaintiff sent a written follow-up email to Saunders inquiring as to when she could expect to hear from regional compliance leadership regarding her escalated concerns; however, demonstrating a continuing pattern of administrative indifference, Saunders offered absolutely no response to this inquiry.

ONE HUNDRED EIGHTY-EIGHTH On or around May 21, 2025, Plaintiff engaged in formal protected activity under the FMLA by submitting formal medical documentation requesting intermittent FMLA leave due to a qualified serious health condition, specifically, severe psychological trauma and medical distress violently re-triggered by Jackowski's ongoing retaliatory harassment and physical ambush earlier in the year, thereby putting the co-employment enterprise on direct statutory notice of her protected medical status.

ONE HUNDRED EIGHTY-NINTH On July 3, 2025, Plaintiff engaged in further formal protected activity by sending a written text disclosure to her supervisor, Caputo, to report an egregious clinical protocol violation and a severe breach of patient confidentiality committed by a unit physician on the floor.

ONE HUNDRED NINETIETH In that same July 3, 2025, disclosure, Plaintiff factually documented that the physician had attempted to conduct a sensitive psychiatric evaluation regarding a vulnerable patient's acute mental health status directly inside a public hallway in front of the patient's peers; and explicitly reported that when the patient objected to this exposure and requested basic clinical privacy, the physician perfunctorily refused to secure a private space, which non-compliant conduct legally constituted an improper quality of patient care and a severe violation of mandatory patient privacy regulations.

ONE HUNDRED NINETY-FIRST Plaintiff forwarded her complete compliance correspondence file to an external executive advocate and organizational ombudsman, Yvonne Armstrong ("Armstrong"), explicitly requesting administrative support and remediation regarding the ongoing statutory violations, discrimination, and retaliatory hazards she was experiencing from SBELIH management.

ONE HUNDRED NINETY-SECOND When Armstrong did not respond, Plaintiff generated a further contemporaneous record of her protected opposition by sending written follow-up disclosures to her on September 21, 2025, and October 30, 2025; however, demonstrating ongoing administrative indifference, both of those communications went entirely unanswered.

ONE HUNDRED NINETY-THIRD On September 30, 2025, Plaintiff engaged in high-priority formal protected activity by sending an urgent written text disclosure to Caputo and Chapman to report a catastrophic clinical failure and a severe violation of mandatory medical safety regulations regarding a vulnerable psychiatric patient on the unit.

ONE HUNDRED NINETY-FOURTH In that same September 30, 2025, disclosure, Plaintiff factually documented that a rehab patient had been administered completely incorrect medications while on the 2S Psychiatry Unit, which severe error was further compounded by management's delayed administration of the patient's mandatory psychiatric injection and the Assertive Community Treatment (ACT) Team's acute concerns regarding the rapid deterioration of the patient's mental health status; which non-compliant medical errors legally constituted an improper quality of patient care and a substantial, specific, and life-threatening danger to both patient and public safety under NYLL §§ 740 and 741.

ONE HUNDRED NINETY-FIFTH On October 29, 2025, in response to a pervasive and toxic workplace rumor circulating on the unit, Plaintiff sent a written text inquiry to Chapman to address information that management was actively moving to terminate her employment.

ONE HUNDRED NINETY-SIXTH Chapman responded by stating it was his belief that the report was merely an unverified rumor; however, Plaintiff utilized the interaction to engage in further protected activity by explicitly notifying Chapman that she was being systematically

targeted, bullied, and harassed on the unit in direct retaliation for her ongoing compliance reporting.

ONE HUNDRED NINETY-SEVENTH On December 2, 2025, a mere month after Plaintiff's final written escalations regarding patient safety and workplace hostility, the co-employment enterprise escalated its campaign of retaliatory harassment by forcing Plaintiff to attend a third administrative disciplinary meeting regarding a completely trivial, manufactured (pretextual) matter involving empty recycling cans.

ONE HUNDRED NINETY-EIGHTH This meeting included SBELIH HR representative Kiera Hayes ("Hayes") and external employee advocates, during which the enterprise's administration bad faith asserted the absurd conclusion that Plaintiff had violated facility policy by leaving the hospital carrying a bag of empty aluminum cans to recycle, which minor items management claimed belonged to the hospital facility.

ONE HUNDRED NINETY-NINTH Plaintiff was informed that counselor Price, the individual whom Jackowski had previously promoted over Plaintiff in violation of standard protocols, was the specific administrative plant utilized by management to spy on Plaintiff and report the completely benign, non-violative recycling interaction, thereby explicitly demonstrating a coordinated, highly orchestrated pretextual scheme designed to manufacture a fraudulent basis for termination due to Plaintiff's ongoing engagement in protected activity, thereby establishing a direct causal connection to her patient safety disclosures, compliance reporting, and formal opposition to race discrimination and retaliatory harassment.

TWO HUNDREDTH During the meeting, HR bad-faith asserted the absurd conclusion that Plaintiff had left the hospital carrying a bag of empty aluminum cans to recycle, which

minor items management claimed belonged to the hospital facility; informing Plaintiff that counselor Price had been utilized to surveil and report this benign, non-violative interaction.

TWO HUNDRED FIRST Following its fraudulent determination, the co-employment enterprise executed another severe adverse employment action by issuing Plaintiff a second Corrective Action Final Written Warning ("Final Warning 2") for an alleged failure to follow safety rules, alleged disrespectful or inappropriate interactions with partners and volunteers, and an alleged failure to uphold "ICARE" values relating entirely to the recycling of empty cans.

TWO HUNDRED SECOND Final Warning 2 explicitly referenced Plaintiff's prior November 7, 2024, Final Warning to manufacture a fraudulent paper trail of progressive discipline and explicitly stated that any future alleged policy violations would result in further disciplinary action, up to and including immediate termination, thereby establishing a highly orchestrated, pretextual mechanism designed to finalize a fraudulent basis for discharge in direct retaliation for Plaintiff's persistent, protected activity.

TWO HUNDRED THIRD Plaintiff immediately engaged in formal protected activity by demanding that the co-employment enterprise permit an independent administrative review to challenge the validity of Final Warning 2 and expose the retaliatory animus underlying the recycling accusation.

TWO HUNDRED FOURTH In a further act of retaliation, reflecting a severe breakdown in corporate compliance and a coordinated institutional effort to suppress Plaintiff's protected opposition, the enterprise's administration perfunctorily blocked and refused her request for review, permitting the fraudulent discipline to stand uncorrected and explicitly cutting off her administrative channels of appeal to insulate the retaliatory warning from objective scrutiny.

TWO HUNDRED FIFTH On December 2, 2025, immediately following the receipt of the retaliatory Final Warning 2, Plaintiff generated an immediate contemporaneous written record of the workplace hostility by sending a text disclosure to Clinical Social Work Supervisor Chapman, putting management on direct notice of the third HR meeting regarding the recycling of empty cans and the issuance of the secondary warning.

TWO HUNDRED SIXTH In that same December 2, 2025, disclosure, Plaintiff engaged in further formal protected activity under the FMLA by explicitly notifying Chapman that she was severely struggling under the weight of the enterprise's unmitigated retaliatory harassment and hostile work environment, putting the co-employment enterprise on direct statutory notice of her intent to invoke protected FMLA medical leave to treat her severe psychological injuries.

TWO HUNDRED SEVENTH On February 5, 2026, Plaintiff engaged in high-priority formal protected activity and compliance reporting under NYLL §§ 740 and 741 by sending an urgent written text disclosure to Chapman to report an egregious clinical protocol violation and a severe breach of patient confidentiality committed by an acute care physician, Dr. Zubi Razzak ("Razzak").

TWO HUNDRED EIGHTH In that February 5, 2026, text disclosure to Chapman, Plaintiff factually documented that Razzak was actively failing to address a vulnerable patient's acute psychiatric needs and was instead aggressively discussing the patient's sensitive mental health concerns directly in public areas in front of other individuals on the unit floor; which non-compliant conduct legally constituted an improper quality of patient care and an unmitigated, substantial, and specific danger to public health and patient safety.

TWO HUNDRED NINTHPlaintiff further documented that she had immediately engaged in active clinical advocacy by confronting the physician on the floor, explicitly requesting that

Razzak step aside to speak with the psychiatric patient in private to maintain mandatory patient privacy regulations and facility safety standards, which ethical intervention prompted the co-employment enterprise to escalate its retaliatory campaign to finalize her termination.

TWO HUNDRED TENTH On February 9, 2026, Plaintiff engaged in high-priority formal protected activity and compliance reporting under NYLL §§ 740 and 741 by sending an urgent written text disclosure to Chapman to report an active, egregious breach of infectious disease control protocols and discriminatory patient treatment on the unit.

TWO HUNDRED ELEVENTH In her February 9, 2026, compliance disclosure, Plaintiff factually documented that two unit physicians were actively permitting a patient diagnosed with Respiratory Syncytial Virus ("RSV") to freely walk around public unit spaces wearing only a basic mask, thereby exposing and putting other vulnerable patients, clinical staff, and visitors at immediate risk of infection; while concurrently documenting that another patient with the exact same RSV diagnosis was being strictly required to self-isolate in their room.

TWO HUNDRED TWELFTH Plaintiff explicitly reported to management that this reckless and inconsistent enforcement of infection control measures legally constituted an improper quality of patient care, institutional non-compliance, and an unmitigated, substantial, and specific danger to public health and safety under NYLL §§ 740 and 741.

TWO HUNDRED THIRTEENTH On February 11, 2026, Plaintiff observed that one of the active RSV-positive patients was repeatedly permitted to roam public areas of the unit without wearing a mask, thereby directly contaminating common spaces and jeopardizing the physical health and safety of everyone on the unit floor.

TWO HUNDRED FOURTEENTH Plaintiff immediately engaged in further formal protected activity by notifying the unit nursing staff of this critical hazard, at which point the

nursing staff explicitly admitted to Plaintiff that they were aware of the safety violation but were completely unsure why patients with active RSV were even permitted in public unit spaces under SBELIH's mandatory RSV protocols.

TWO HUNDRED FIFTEENTH Under SBELIH's established infectious disease protocols, patients who test positive for RSV are strictly required to remain isolated in their hospital rooms, and any clinical staff entering those isolation rooms must be fully protected by donning mandatory personal protective equipment, including gowns, gloves, and masks, none of which mandatory safety protocols were being enforced by management.

TWO HUNDRED SIXTEENTH In response to this systematic breakdown of infection control, Plaintiff engaged in persistent, protected activity by making several direct compliance attempts to reach the resident physician to demand the immediate isolation of the unmasked, contagious patient.

TWO HUNDRED SEVENTEENTH Following Plaintiff's persistent advocacy for safety in the hospital, the contagious patient was finally ordered to return to her isolation room by SBELIH Unit Medical Director Dr. Jarid Pachter ("Pachter"); however, demonstrating an ongoing, reckless disregard for public health standards and an improper quality of patient care, Pachter perfunctorily reversed the order the very next day, allowing the contagious RSV patient back into public unit spaces and creating a substantial, specific, and unmitigated danger to public health and patient safety under NYLL §§ 740 and 741.

TWO HUNDRED EIGHTEENTH On February 11, 2026, Plaintiff engaged in further formal protected activity by documenting and factually reporting that Pachter was actively inside an infectious patient's isolation room wearing only a basic mask, in direct violation of mandatory

institutional policy requiring full protective gear and severely increasing the active risk of spreading RSV to staff and vulnerable patients across the entire floor.

TWO HUNDRED NINETEENTH On that same day, February 11, 2026, Plaintiff attempted to escalate these egregious protocol violations by contacting the facility's infectious disease control department; however, reflecting a systematic breakdown in administrative oversight, her direct compliance tracking was unsuccessful, and she was unable to leave an emergency message.

TWO HUNDRED TWENTIETH On February 15, 2026, Plaintiff engaged in high-priority formal protected activity and compliance reporting under NYLL §§ 740 and 741 by sending an urgent written text disclosure to the unit nursing supervisor to report a severe, life-threatening institutional security failure, notifying management that she had just discovered and recovered an illicit weapon, specifically, a shank, on the behavioral health unit.

TWO HUNDRED TWENTY-FIRST Upon taking possession of the shank, the nursing supervisor explicitly admitted to Plaintiff that management would perfunctorily refuse to conduct a mandatory sweep or search of patient rooms to secure the floor, explicitly citing severe facility staffing shortages as the administrative basis for leaving the unit completely unmitigated and unprotected.

TWO HUNDRED TWENTY-SECOND On February 16, 2026, Plaintiff engaged in further formal protected activity by escalating this dangerous safety issue, specifically, the recovery of the shank, to Chapman, providing direct notice of the unmitigated hazard, the administration's refusal to sweep the floor, and the severe, substantial, and specific danger this operational neglect posed to the physical lives and safety of clinical staff, patients, and the public on the unit.

TWO HUNDRED TWENTY-THIRD On February 17, 2026, Plaintiff engaged in further formal protected activity by sending an urgent written text disclosure to Chapman, factually reporting that unit nursing staff were actively refusing to allow patients to bring in personal blankets to protect themselves against the unmitigated, uncomfortably cold temperatures on the floor, despite intake having previously instructed patients that they were permitted to bring them.

TWO HUNDRED TWENTY-FOURTH In that same February 17, 2026, text disclosure, Plaintiff engaged in explicit protected activity under Title VII, NYSHRL and NYEL by directly challenging retaliatory economic sidelining and disparate treatment, formally reporting to Chapman that Jackowski's ongoing, unmitigated retaliatory animus had resulted in an arbitrary, bad-faith denial of Plaintiff's overtime requests, an adverse administrative restriction that directly impaired her ability to provide continuous, mandatory clinical coverage for her patients.

TWO HUNDRED TWENTY-FIFTH In mid-February 2026, Plaintiff engaged in high-priority formal protected activity and compliance reporting under NYLL §§ 740 and 741 by aggressively advocating on behalf of a highly vulnerable pregnant patient suffering from severe chemical addiction and complex medical concerns, directly opposing an improper quality of patient care when Pachter attempted to block the patient from receiving a medically necessary dental procedure that had already been explicitly authorized by SBELIH Chief Medical Officer Dr. Alison Madden ("Madden").

TWO HUNDRED TWENTY-SIXTH Chapman was directly present for and possessed actual, concurrent knowledge of this clinical conflict, during which Plaintiff explicitly notified management that blocking an authorized, medically necessary procedure for a high-risk pregnant patient constituted a severe breach of professional healthcare regulations and patient care standards.

TWO HUNDRED TWENTY-SEVENTH Immediately following this incident, in February 2026, Plaintiff engaged in further formal protected activity under New York healthcare whistleblower laws by submitting a formal disclosure to Chapman, explicitly objecting to management's dangerous and non-compliant plan to summarily discharge this same high-risk pregnant patient directly to SBELIH's sober house facility before she was clinically stabilized and prior to exhausting all efforts to secure a safer, more structured environment for both the patient and her unborn child.

TWO HUNDRED TWENTY-EIGHTH To mitigate this severe operational safety hazard and maintain compliant patient care standards, Plaintiff requested formal administrative authorization to submit an immediate extension request to the patient's insurance provider to secure additional coverage days, explicitly advising Chapman that the enterprise was legally required to exhaust every avenue to secure long-term inpatient clinical treatment for the pregnant patient and her unborn child, leaving a premature transfer to a sober house strictly as an un-stabilized last resort.

TWO HUNDRED TWENTY-NINTH In a direct manifestation of retaliatory animus and a reckless disregard for patient safety, Jackowski summarily denied Plaintiff's insurance extension request without providing any clinical or administrative justification, effectively forcing the premature discharge of the high-risk pregnant patient.

TWO HUNDRED THIRTIETH Refusing to complicitly accept this hazardous directive, Plaintiff immediately engaged in high-priority formal protected activity under NYLL §§ 740 and 741 by contacting Madden to formally report and object to the unsafe discharge plan, explicitly disclosing that forcing a high-risk pregnant patient with acute addiction concerns out of the

facility without clinical stabilization constituted an improper quality of patient care and a substantial and specific danger to public health and safety.

TWO HUNDRED THIRTY-FIRST On February 23, 2026, due to a severe state of emergency snowstorm, the co-employment enterprise issued an administrative directive to Plaintiff, explicitly designating her as an essential medical asset of SBELIH who was required to remain available twenty-four hours a day, seven days a week (24/7) and mandating that she report to the facility to work her designated clinical shifts.

TWO HUNDRED THIRTY-SECOND To ensure compliance with this 24/7 operational mandate during the environmental crisis, management explicitly notified Plaintiff that dedicated overnight beds were being made available inside the facility for her immediate use should the hazardous road conditions render it physically unsafe for her to commute home following her shift, thereby further demonstrating her unblemished and highly essential operational status within the hospital enterprise.

TWO HUNDRED THIRTY-THIRD On February 23, 2026, due to the severe, unmitigated psychological trauma and medical distress actively re-triggered by the hostile work environment and the imminent threat of encountering her primary harasser, Director Jackowski, inside the facility overnight, Plaintiff officially invoked her statutory rights and took her first protected intermittent medical leave day under the FMLA.

TWO HUNDRED THIRTY-FOURTH On February 25, 2026, Plaintiff attended an operational unit meeting with Jaworowski, Chapman, and Caputo, who had recently returned to active duty following a maternity leave.

TWO HUNDRED THIRTY-FIFTH During this administrative meeting, Jaworowski engaged in protected compliance reporting by expressing severe concerns regarding a profound

breakdown in unit order, escalating clinical boundary issues, and a pervasive lack of operational support from upper management.

TWO HUNDRED THIRTY-SIXTH Plaintiff immediately engaged in formal protected activity and compliance reporting under NYLL §§ 740 and 741 by corroborating Jaworowski's assessments and factually disclosing to Caputo and Chapman that the unit was suffering from a systematic administrative failure; explicitly reporting that the facility had devolved into a non-compliant environment where patients were effectively being held for routine housing rather than receiving active, mandatory clinical treatment.

TWO HUNDRED THIRTY-SEVENTH Plaintiff further documented and reported that because management perfunctorily refused to enforce structured compliance protocols or implement clinical consequences for non-compliance, vulnerable psychiatric patients were left completely un-stabilized, exhibiting severely unstable, aggressive, and disruptive behaviors while refusing to participate in mandatory therapeutic groups, thereby directly creating an improper quality of patient care and a substantial and specific danger to the safety of both staff and patients on the unit floor.

TWO HUNDRED THIRTY-EIGHTH During that same February 25, 2026 meeting, Plaintiff further engaged in formal protected activity and compliance reporting under NYLL §§ 740 and 741 by explicitly disclosing that unit physicians were routinely failing to address patients' acute psychiatric and physical health needs, which pervasive clinical neglect directly constituted an improper quality of patient care and left both clinical staff and patients inside an objectively unsafe environment lacking any operational structure or behavioral accountability

TWO HUNDRED THIRTY-NINTH Plaintiff explicitly notified Caputo and Chapman of a catastrophic breakdown in the facility's life-safety infrastructure, factually documenting that

when she previously activated her localized emergency code button for critical safety support during patient crises, no security or response personnel arrived on the floor; further reporting that emergency codes were either being dangerously routed to the incorrect facility location or falsely reported to hospital staff as cancelled when no such cancellation had occurred.

TWO HUNDRED FORTIETH Plaintiff she has activated the code button for support only to have no one come, the code called to the incorrect location or reported to staff that the code was cancelled, when that was not case.

TWO HUNDRED FORTY-FIRST In that same February 25, 2026 meeting, Plaintiff engaged in explicit protected activity under the FMLA, NYSHRL and NYEL, directly informing Caputo and Chapman that the unmitigated, severe psychological trauma inflicted by the hostile work environment she was subjected due to her ongoing engagement in protected activity, had forced her to officially invoke and execute her first protected intermittent FMLA medical leave day on February 23, 2026, due to the fact that management's failure to maintain a secure environment rendered her physically and professionally unsafe staying inside the facility overnight without the ability to leave.

TWO HUNDRED FORTY-SECOND On February 26, 2026, the very next day, Plaintiff generated a further contemporaneous written record of her protected opposition by sending a text disclosure to Caputo and Chapman to report a recurring, severe security violation, explicitly objecting to staff routinely permitting active psychiatric rehabilitation patients to maintain unrestricted access to personal cellular devices in direct violation of strict facility safety regulations designed to prevent the illicit procurement of outside contraband.

TWO HUNDRED FORTY-THIRD On February 26, 2026, while performing her mandatory duties on the unit, Plaintiff was subjected to a hostile and volatile clinical encounter with an acute psychiatric rehabilitation patient, designated as Patient L.

TWO HUNDRED FORTY-FOURTH During this interaction, Patient L became highly aggressive and explicitly threatened to execute a bad-faith administrative assault against Plaintiff, overtly stating that he was going to intentionally twist Plaintiff's words and file a fraudulent institutional report falsely claiming that Plaintiff had called him an "asshole" and a "horrible person.

TWO HUNDRED FORTY-FIFTH In a direct attempt to intimidate and coerce a clinical professional, Patient L aggressively escalated his verbal threats on the unit floor, explicitly declaring to Plaintiff that he would "have her job."

TWO HUNDRED FORTY-SIXTH Immediately following this hostile confrontation, two (2) independent patients on the unit approached Plaintiff at her office to engage in protected peer reporting, notifying Plaintiff that Patient L was actively roaming the unit floor and soliciting other patients to "have his back" by conspiring to submit matching false statements to administration so that Plaintiff would lose her employment.

TWO HUNDRED FORTY-SEVENTH Because the entire day room and unit floor area was under continuous, high-definition electronic surveillance monitoring, Plaintiff was confident that the facility's exculpatory video footage would conclusively disprove any fabricated statements manufactured by Patient L or any suborned patients, as the co-employment enterprise was under a strict, ongoing legal and regulatory obligation to permanently preserve all such video evidence of active unit crises.

TWO HUNDRED FORTY-EIGHTH On February 27, 2026, Plaintiff immediately engaged in formal protected activity by submitting a comprehensive disclosure to Caputo and Chapman, factually reporting Patient L's hostile behavior and explicitly putting management on direct notice of the patient's orchestrated plan to manufacture a fraudulent institutional complaint against her.

TWO HUNDRED FORTY-NINTH On March 2, 2026, due to the severe, unmitigated medical and psychological distress re-triggered by this ongoing workplace hostility, Plaintiff again exercised her federal statutory rights and took a qualified, protected intermittent medical leave day under the FMLA.

TWO HUNDRED FIFTIETH On that exact same day, March 2, 2026, in a flagrant violation of federal law and an explicit act of FMLA interference and retaliatory harassment, Merin actively hunted Plaintiff down while she was out on approved medical leave, leaving an urgent voicemail and sending an email demanding that Plaintiff immediately contact HR to submit to an administrative meeting.

TWO HUNDRED FIFTY-FIRST Plaintiff returned Merin's call and explicitly advised her that she was legally unable to attend an administrative meeting or perform workplace duties that day because she was currently out of the hospital utilizing a protected intermittent FMLA leave day to treat her qualified medical impairment.

TWO HUNDRED FIFTY-SECOND During this same March 2, 2026, communication, Plaintiff engaged in further formal protected activity by explicitly notifying Merin that the sudden administrative urgency was transparently a retaliatory escalation tied directly to the February 26, 2026, incident with Patient L, re-stating for the record that she had already formally disclosed Patient L's explicit threats to manufacture a fraudulent complaint to get her fired.

TWO HUNDRED FIFTY-THIRD Plaintiff further explicitly disclosed to Merin that she had already formally reported the entire clinical encounter to supervisors Caputo and Chapman, providing a complete administrative baseline detailing Patient L's explicit plan to manufacture false accusations to get Plaintiff fired.

TWO HUNDRED FIFTY-FOURTH Plaintiff then engaged in formal protected activity under Title VII, NYSHRL and NYEL by demanding a dedicated administrative opportunity to speak comprehensively with Human Resources regarding the severe, unmitigated psychological trauma she was experiencing due to the hostile work environment, which unlawful conditions management directly sustained through a systematic lack of operational support, clinical consistency, and structural safety on the unit.

TWO HUNDRED FIFTY-FIFTH In that same March 2, 2026, compliance communication, Plaintiff engaged in high-priority formal protected activity under NYLL §§ 740 and 741, putting HR on direct notice of the severe life-safety breakdown on the floor by explicitly reporting the recovery of the illicit weapon, specifically, the shank manufactured out of a plastic fork, and disclosing that management's refusal to sweep the rooms left the unit objectively unsafe, creating an unmitigated, substantial, and specific danger to the physical lives and safety of both patients and staff.

TWO HUNDRED FIFTY-SIXTH In an attempt to control the intake of this massive safety compliance disclosure, Merin cut off the conversation and informed Plaintiff that she would suspend further discussions until a formalized administrative meeting could be scheduled with external employee advocates present.

TWO HUNDRED FIFTY-SEVENTH On March 2, 2026, at approximately 5:50 P.M., a mere hour after Plaintiff delivered these comprehensive disclosures exposing the facility's life-

safety hazards, FMLA usage, and supervisor complicity in a patient's fraudulent conspiracy, the co-employment enterprise executed a severe, materially adverse employment action by sending Plaintiff an immediate email notice of unpaid suspension pending the outcome of an investigation regarding a potential conduct violation.

TWO HUNDRED FIFTY-EIGHTH On March 2, 2026, immediately following receipt of the suspension notice, Plaintiff generated a further contemporaneous written record of her protected opposition by sending a text disclosure to supervisors Caputo and Chapman regarding the retaliatory suspension.

TWO HUNDRED FIFTY-NINTH In her March 2, 2026,text disclosure, Plaintiff explicitly demanded that Caputo fulfill her mandatory administrative tracking duties by entering an objective clinical notation into Patient L's medical chart regarding the hostile encounters on February 26, 2026; explicitly reminding Caputo that she had personally witnessed Patient L screaming, cursing, and creating a severe unit disturbance when asked to comply with standard unit expectations, thereby confirming management possessed actual, eye-witness knowledge that the patient's subsequent allegations were entirely fabricated.

TWO HUNDRED SIXTIETH In a devastating operational exposure of management's retaliatory pretext, while Plaintiff was actively placed on a manufactured disciplinary suspension, she automatically received two official hospital "iCARE" Awards, one for Integrity and the other for Compassion.

TWO HUNDRED SIXTY-FIRST Because these prestigious institutional accolades explicitly recognize high performance on a strict range of quality and safety indicators that reflect the hospital's core executive values of integrity, compassion, accountability, respect, and excellence, the concurrent issuance of these awards conclusively demonstrates that Plaintiff performed her

duties unsatisfactorily only in the retaliatory notes of her harassers, completely exposing the disciplinary conduct investigation as a bad-faith administrative sham and in direct retaliation of her ongoing engagement in protected activity.

TWO HUNDRED SIXTY-SECOND On March 4, 2026, the co-employment enterprise forced Plaintiff to submit to a formalized administrative compliance hearing conducted via Microsoft Teams; an irregular corporate gathering assembled to finalize her discipline that included SBELIH Assistant VP of Behavioral Health & Regulatory Affairs Alyse Scura-Mohammed ("Scura-Mohammed"), HR Merin, Caputo, and external employee advocates, including Brandon Douglas ("Douglas"). ("Douglas'").

TWO HUNDRED SIXTY-THIRD The primary administrative focus of the March 4, 2026, compliance hearing centered entirely upon Patient L's fabricated accusation that Plaintiff had allegedly recorded him on her personal cellular device and referred to him as an "asshole" and a "horrible person."

TWO HUNDRED SIXTY-FOURTH Plaintiff stated she did not record him, did not call him an asshole or a horrible person.

TWO HUNDRED SIXTY-FIFTH Plaintiff clarified the benign, professional context of the clinical encounter, explaining that after Patient L became highly aggressive, disrupted the unit floor, and called Plaintiff a "horrible counselor," she had merely utilized standard clinical boundary-setting by professionally advising the patient that his disruptive behavior on the unit was unacceptable.

TWO HUNDRED SIXTY-SIXTH Plaintiff then utilized the high-level compliance hearing to engage in formal protected activity and compliance reporting under NYLL §§ 740 and 741, explicitly disclosing to Merin a severe, unmitigated regulatory breakdown on the unit floor:

factually documenting that Patient L had tested completely negative for marijuana upon admission, but had actively tested positive for illicit drugs while actively undergoing treatment inside the facility.

TWO HUNDRED SIXTY-SEVENTH Plaintiff explicitly notified the administrative panel that Patient L's ongoing dishonesty, clinical manipulation, and dangerous behavioral infractions were already thoroughly documented within his official medical chart; firmly reporting that management's complete failure to address a patient illicitly procuring and consuming narcotics inside an acute behavioral health program legally constituted an improper quality of patient care, institutional non-compliance, and an unmitigated, substantial, and specific danger to public health and patient safety.

TWO HUNDRED SIXTY-EIGHTH On March 11, 2026, Plaintiff received an email from Scura-Mohammed requesting that Plaintiff review her written administrative summary of the March 4, 2026, Microsoft Teams hearing, implement any necessary modifications, and execute the document with her signature.

TWO HUNDRED SIXTY-NINTH Reflecting a coordinated, bad-faith effort to distort the factual record and manufacture a false admission of guilt, the written summary prepared by Scura-Mohammed textually and inaccurately reported that Plaintiff had allegedly admitted to calling Patient L a "horrible person."

TWO HUNDRED SEVENTIETHOn March 13, 2026, Plaintiff engaged in formal protected activity by emailing Scura-Mohammed the meeting summary with the fraudulent text explicitly corrected and deleted as requested, refuse to execute any document that falsified her testimony or validated their retaliatory pretext.

TWO HUNDRED SEVENTY-FIRST On March 19, 2026, Plaintiff generated a further contemporaneous written record of her protected opposition by transmitting a formal compliance disclosure to external employee advocates and regional compliance leadership, aggressively challenging why the co-employment enterprise continued to ignore her formal administrative appeals against the fraudulent December 5, 2025, Final Warning 2.

TWO HUNDRED SEVENTY-SECOND In that same March 19, 2026, compliance communication, Plaintiff explicitly demanded an immediate investigation into why her multiple, formal written requests to update and execute the revised administrative documentation regarding her withheld wages had gone completely unanswered; openly questioning the enterprise's ongoing, multi-month pattern of economic coercion and deliberate indifference to her persistent safety and anti-discrimination disclosures.

TWO HUNDRED SEVENTY-THIRD Plaintiff did not receive a response from external employee advocates and subsequently engaged in formal protected activity by filing an official administrative agency charge on April 16, 2026, challenging the co-employment enterprise's ongoing, unlawful retaliation.

TWO HUNDRED SEVENTY-FOURTH On March 23, 2026, Plaintiff was forced to submit to a follow-up administrative investigative interview with Merin, Caputo and Chapman, with external employee advocates present.

TWO HUNDRED SEVENTY-FIFTH During this interview, Plaintiff submitted definitive, exculpatory evidence consisting of a time-stamped screenshot of a text message sent to a coworker at the exact time Patient L alleged Plaintiff was recording him, conclusively and factually dismantling the patient's fabricated claims and providing management with absolute, objective proof that the allegations against her were entirely false.

TWO HUNDRED SEVENTY-SIXTH Reflecting a coordinated, bad-faith intent to ignore exculpatory evidence and finalize a fraudulent paper trail, Merin perfunctorily disregarded the text evidence and persistently asserted the bad-faith conclusion that Plaintiff had allegedly called Patient L a "horrible person."

TWO HUNDRED SEVENTY-SEVENTH Plaintiff immediately corrected Merin's retaliatory distortion, clarifying the benign context of the encounter by factually explaining that Patient L had aggressively called Plaintiff a "horrible counselor," and that Plaintiff had merely professionally stated in response that the patient's disruptive behavior was horrible.

TWO HUNDRED SEVENTY-EIGHTH On March 31, 2026, Plaintiff generated a further contemporaneous written record of her protected opposition by transmitting a formal email notification to external employee advocates and regional compliance leadership, re-escalating her objections to the manufactured discipline and demanding the immediate execution of a comprehensive administrative appeal to challenge the enterprise's unlawful actions.

TWO HUNDRED SEVENTY-NINTH Plaintiff did not receive any response or administrative remediation from management regarding her March 31, 2026, appeal request.

TWO HUNDRED EIGHTIETH On April 1, 2026, Plaintiff generated a further comprehensive written record of her protected opposition by transmitting a formal compliance disclosure to external employee advocates, re-escalating her objections to the enterprise's ongoing administrative retaliation, severe economic coercion, and the unmitigated physical and professional intimidation executed by Jackowski.

TWO HUNDRED EIGHTY-FIRST In that same April 1, 2026, disclosure, Plaintiff explicitly reported the direct causal connection underlying her ongoing discipline, detailing for the record that each time she sought administrative intervention from Human Resources

regarding Jackowski's hostile behavior, the co-employment enterprise responded in direct retaliation by immediately issuing her a fraudulent disciplinary write-up, which retaliatory pattern was textually deployed by the enterprise to suppress her ongoing patient safety disclosures, compliance reporting, and formal opposition to race discrimination and retaliatory harassment.

TWO HUNDRED EIGHTY-SECOND On Reflecting a continuing pattern of corporate deliberate indifference to severe workplace misconduct, Plaintiff received no response or corrective action regarding her April 1, 2026, disclosure.

TWO HUNDRED EIGHTY-THIRD On April 2, 2026, Plaintiff engaged in formal protected activity and compliance reporting under NYLL §§ 740 and 741 by sending a written notification to supervisors Caputo and Chapman, demanding an immediate, comprehensive administrative review to challenge the validity of the progressive discipline stacked against her.

TWO HUNDRED EIGHTY-FOURTH In response to this high-priority escalation, on April 2, 2026, Plaintiff received an email communication from SBELIH Employee and Labor Relations Director Joe Libertelli ("Libertelli"), requesting to schedule a formal administrative compliance meeting with her on April 9, 2026.

TWO HUNDRED EIGHTY-FIFTH On April 7, 2026, Plaintiff transmitted a written follow-up disclosure to external employee advocates to formally log Libertelli's reach-out and to officially secure the presence of independent advocacy representatives for the upcoming compliance hearing.

TWO HUNDRED EIGHTY-SIXTH On April 9, 2026, Plaintiff attended the formalized administrative compliance meeting with Libertelli, during which she was accompanied by external employee advocates to verbally re-escalate her severe objections regarding the hostile

work environment, systematic administrative retaliation, and unaddressed patient safety hazards on the unit.

TWO HUNDRED EIGHTY-SEVENTH During this April 9, 2026, compliance meeting, Plaintiff engaged in explicit protected activity under Title VII, NYSHRL and NYEL, by directly challenging the co-employment enterprise's discriminatory and disparate disciplinary practices, citing clear, objective comparators to demonstrate that her unpaid suspension was an act of targeted retaliation.

TWO HUNDRED EIGHTY-EIGHTH Specifically, Plaintiff factually documented that a Black female nurse who had actively threatened a patient on the unit was merely reassigned and moved to another floor, rather than being placed on a severe administrative suspension pending an investigation explained three was a white male certified nursing assistant that was accused of inappropriate body searches and HIPAA violations who was also moved to another unit, not suspended pending an investigation.

TWO HUNDRED EIGHTY-NINTH Plaintiff further documented that a White male Certified Nursing Assistant ("CNA") who had been accused of performing highly inappropriate body searches and committing severe HIPAA violations was likewise merely transferred to an alternative unit, rather than being subjected to a punitive administrative suspension, thereby conclusively demonstrating to management that the enterprise applied a harsher, non-uniform disciplinary standard to Plaintiff to execute a materially adverse employment action and a pretextual disciplinary framework in direct retaliation for her protected activity.

TWO HUNDRED NINETIETH Plaintiff additionally engaged in high-priority formal protected activity and external whistleblower disclosures under NYLL §§ 740 and 741 by notifying Libertelli that she had contacted the New York State Justice Center for the Protection

of People with Special Needs ("Justice Center") to report the unit crises and investigate management's administrative actions.

TWO HUNDRED NINETY-FIRST Plaintiff informed Libertelli that she had bypassed internal channels to contact the Justice Center specifically because SBELIH management had provided her with fraudulent information, falsely asserting that the administrative investigation into her conduct was being delayed because the Justice Center was directly involved in the review.

TWO HUNDRED NINETY-SECOND Plaintiff explicitly reported that the Justice Center had factually debunked management's deceptive narrative, confirming directly to Plaintiff that any decision to administratively suspend, discipline, or terminate an employee rest exclusively with SBELIH executive administration, and exposing management's bad-faith concealment and pretextual manipulation of external regulatory oversight to sustain their unlawful retaliation

TWO HUNDRED NINETY-THIRD During that same April 9, 2026, compliance meeting, external employee advocates formally noted that reviewing the exculpatory security recordings would not constitute a privacy violation under HIPAA, as the representatives involved maintained compliant authorization protocols within the enterprise network; in response to which explicit demand, Labor Relations Director Libertelli stated he would investigate the availability of the footage.

TWO HUNDRED NINETY-FOURTH During this same April 9, 2026, administrative meeting, Plaintiff engaged in high-priority formal protected activity and compliance reporting under NYLL §§ 740 and 741, aggressively re-escalating severe, ongoing institutional safety failures and public health hazards directly to the Director of Labor Relations.

TWO HUNDRED NINETY-FIFTH Specifically, Plaintiff orally disclosed and objected to the fact that active RSV-positive patients were being routinely permitted to roam public areas of the unit without masks in violation of infectious disease control protocols, that management had perfunctorily refused to investigate or sweep the floor after Plaintiff recovered an illicit weapon (the shank), and that the facility's life-safety infrastructure remained broken because emergency code activations routinely went completely unanswered or were dangerously routed to the incorrect facility location, explicitly reporting that these unmitigated failures directly created an improper quality of patient care and an unmitigated, substantial, and specific danger to public health and safety.

TWO HUNDRED NINETY-SIXTH On April 16, 2026, a mere seven (7) days after Plaintiff delivered these comprehensive, high-priority safety and discrimination disclosures directly to the Director of Labor Relations, the co-employment enterprise forced Plaintiff to submit to a final administrative meeting assembled by Merin, Caputo, Chapman, with external employee advocates present, to abruptly close out the manufactured conduct investigation.

TWO HUNDRED NINETY-SEVENTH On At that time, the co-employment enterprise executed the ultimate severe, materially adverse employment action by summarily terminating Plaintiff's employment, effective immediately.

TWO HUNDRED NINETY-EIGHTH Management bad faith asserted that the termination was based upon alleged violations of facility policy, specifically: unsatisfactory work quality/job duties performed below standards; alleged disrespectful or inappropriate interactions with patients, partners, volunteers, and others; and an alleged failure to uphold the hospital's "ICARE" values.

TWO HUNDRED NINETY-NINTH Each and all of the administrative findings and alleged policy violations weaponized to execute her discharge were entirely false, fabricated, and manufactured as a pretextual progressive disciplinary mechanism designed to mask unlawful retaliation and penalize Plaintiff for her persistent engagement in protected activity, her compliance disclosures regarding public health and life-safety hazards, and her formal opposition to race-based discrimination and a hostile work environment, despite the fact that Plaintiff had satisfactorily performed her clinical duties and never committed any regulatory or institutional policy violations

THREE HUNDREDTH On May 7, 2026, Plaintiff was explicitly notified by the co-employment enterprise's administrative representatives that her formal medical benefits would remain actively extended for a baseline period of thirty (30) days following her April 16, 2026 termination date, and was instructed to contact the enterprise's benefits administrator to initiate her federal COBRA enrollment.

THREE HUNDRED FIRST Upon contacting the designated benefits administrator to execute her COBRA health insurance enrollment, Plaintiff was shocked to learn that the co-employment enterprise had actively, deceptively, and retroactively terminated her primary medical coverage effective March 21, 2026, weeks prior to her actual discharge date, thereby rendering her completely ineligible for COBRA continuation coverage and leaving her immediately exposed without vital medical protection.

THREE HUNDRED SECOND On May 9, 2026, Plaintiff received an official written notification from the enterprise dated May 1, 2026, formally confirming that her healthcare benefits had been punitively terminated effective March 21, 2026, due to her prior administrative suspension—thereby demonstrating an ongoing, bad-faith post-termination campaign to strip a

clinical professional of health security and to intentionally disrupt her ongoing medical care for her protected psychological injuries, which adverse action was proximately caused by, and executed in direct retaliation for, her extensive engagement in protected activity and compliance disclosures pursuant to New York Labor Law §§ 740 and 741, Title VII of the Civil Rights Act of 1964, and New York Executive Law § 296, as established by the strict temporal proximity between her protected disclosures and this punitive post-employment deprivation.

THREE HUNDRED THIRD On June 9, 2026, Plaintiff engaged in further formal protected activity by submitting an official administrative appeal to the New York State Department of Labor to aggressively challenge the fraudulent misconduct narrative and demand the immediate restoration of her rightful unemployment compensation.

THREE HUNDRED FOURTH On June 12, 2026, Plaintiff submitted comprehensive exculpatory documentation to the New York State Department of Labor, presenting absolute objective proof that she never engaged in any verbal altercations with a patient, and formally requested a full evidentiary compliance hearing to conclusively expose the co-employment enterprise's retaliatory fraud.

THREE HUNDRED FIFTH During her administrative processing, Plaintiff explicitly reported and documented that she was systematically targeted, harassed, discriminated against, subjected to a hostile work environment, and wrongfully terminated in direct retaliation for her extensive protected activity, specifically her ongoing patient safety disclosures, compliance reporting, and formal opposition to race discrimination.

THREE HUNDRED SIXTH On July 6, 2026, a formalized post-termination administrative compliance and appeal hearing was convened by the co-employment enterprise to

evaluate the validity of Plaintiff's discharge.2026, Plaintiff's termination grievance meeting took place.

THREE HUNDRED SEVENTH In attendance at this formalized compliance hearing were Hayes Merin, Director Jackowski, Caputo, Chapman, and independent employee advocate Douglas.

THREE HUNDRED EIGHTH During the hearing, Hayes in bad faith asserted the unbacked conclusion that unspecified witness statements and unit video surveillance footage supposedly substantiated Patient L's manufactured claims of misconduct against Plaintiff.

THREE HUNDRED NINTH In a direct and devastating exposure of pretextual discrimination and systemic administrative bad faith, independent advocate Douglas, having actively reviewed the exact unit video surveillance recordings in question, strongly rebutted Hayes' assertions, factually reporting for the administrative record that the exculpatory video footage conclusively showed Plaintiff repeatedly walking away from Patient L, maintaining strict professional boundaries, and remaining completely calm and unblemished throughout the entire hostile interaction.

THREE HUNDRED TENTH Despite being presented with direct, objective, and exculpatory video evidence completely disproving the underlying patient allegation, the co-employment enterprise's administration perfunctorily refused to reinstate Plaintiff or rescind the discipline; which bad-faith refusal to correct a visibly manufactured discharge was proximately caused by, and executed in direct retaliation for, her protected activity pursuant to New York Labor Law §§ 740 and 741, Title VII of the Civil Rights Act of 1964, and New York Executive Law § 296 .

THREE HUNDRED ELEVENTH On July 13, 2026, Plaintiff received the formal post-termination administrative appeal determination from the co-employment enterprise.

THREE HUNDRED TWELFTH Despite the extensive, objective, and exculpatory video surveillance evidence and independent advocate testimonies pointing directly to the contrary, Hayes bad-faith determined that SBELIH supposedly took appropriate action in executing the retaliatory termination of Plaintiff's employment.

THREE HUNDRED THIRTEENTH On August 14, 2026, Plaintiff engaged in high-priority formal protected activity by transmitting an explicit written escalation via email to SBELIH Chief Administrative Officer Paul Conner ("Conner"), providing direct notice at the absolute highest level of executive leadership regarding the severe statutory violations being executed against her.

THREE HUNDRED FOURTEENTH In her formal written disclosure to Conner, Plaintiff explicitly reported and objected to the enterprise's bad-faith post-termination campaign, specifically detailing the deceptive and retroactive (adverse) termination of her health insurance benefits, the unlawful withholding of her accrued unpaid paid time off (PTO) wages, the bad-faith opposition to her state unemployment benefits, and demanded an immediate, objective executive review of the retaliatory circumstances surrounding her fraudulent termination.

THREE HUNDRED FIFTEENTH Demonstrating a complete breakdown in corporate compliance and a profound pattern of institutional deliberate indifference, Conner perfunctorily refused to review the systemic misconduct or initiate an objective executive investigation, dismissively referring Plaintiff right back down to the hostile Human Resources department that had actively manufactured the retaliation, all of which executive inaction and refusal to

remediate was executed in bad faith but-for Plaintiff's engagement in ongoing protected activity, compliance disclosures, and formal opposition to discrimination and retaliatory harassment.

THREE HUNDRED SIXTEENTH Conner Plaintiff immediately responded to Conner via a further written compliance record, explicitly clarifying that while she understood HR would ordinarily handle baseline operational matters, she was formally escalating the crisis to him specifically because the Human Resources department itself was actively compromised, acting in severe bad faith, and orchestrating the unlawful retaliatory framework against her, which final notification the Chief Administrative Officer completely ignored.

THREE HUNDRED SEVENTEENTH On August 31, 2026, a formal evidentiary appeal hearing was convened by the New York State Department of Labor to evaluate the co-employment enterprise's administrative allegations of misconduct against Plaintiff.

THREE HUNDRED EIGHTEENTH In a definitive and conclusive administrative default, SBELIH and the co-employment enterprise completely failed to appear or present any witness testimonies at Plaintiff's August 31, 2026, Unemployment Insurance Appeal Hearing, thereby demonstrating an ongoing pattern of bad faith and representing a tacit administrative admission that the enterprise possessed zero credible or objective evidence to factually substantiate its fraudulent and retaliatory misconduct narrative.

THREE HUNDRED NINETEENTH Through the heavily documented, synchronized, and continuous course of conduct detailed above, the co-employment enterprise—by and through its administrative executives and operational supervisors, actively ratified, sustained, and executed a severe, systemic, and multi-layered campaign of discrimination, retaliatory harassment, and economic coercion against Plaintiff. The enterprise's shifting, manufactured, and progressive disciplinary write-ups, suspensions, retroactive health benefit deprivations, and

ultimate summary termination were textually and demonstrably hollow shams; which adverse employment actions were executed in extreme administrative bad faith, represented an ongoing defiance of public health regulations, and would not and could not have occurred but-for Plaintiff's extensive engagement in protected activity, her formal compliance disclosures regarding life-safety hazards and an improper quality of patient care, and her unyielding opposition to race-based discrimination and a hostile work environment under federal and state law.

**FIRST CAUSE OF ACTION**
**(FMLA Retaliation - 29 U.S.C. § 2615(a)(2))**

THREE HUNDRED TWENTIETH Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

THREE HUNDRED TWENTY-FIRST At all relevant times, Plaintiff was an "eligible employee" and Defendant StaffCo, operating as an integrated administrative co-employer within a centralized joint-employment relationship alongside operational hospital executives, was an "employer" within the statutory meaning and definitions of the Family and Medical Leave Act ("FMLA").

THREE HUNDRED TWENTY-SECOND Plaintiff engaged in high-priority federally protected activity under the FMLA by formally requesting, securing administrative authorization for, and actively invoking protected intermittent medical leave to treat a qualified serious health condition, specifically, severe psychological trauma and medical distress actively re-triggered by the unmitigated harassment and hostile working conditions on the unit.

THREE HUNDRED TWENTY-THIRD Following and in direct response to Plaintiff's protected FMLA requests and statutory leave invocations, the co-employment enterprise executed severe, materially adverse employment actions against Plaintiff, including placing her

on a manufactured disciplinary suspension, punitively and retroactively terminating her vital healthcare benefits, and summarily discharging her from her employment.

THREE HUNDRED TWENTY-FOURTH A direct causal connection and proximate nexus exist between Plaintiff's protected FMLA activity and the severe adverse actions executed against her, as the co-employment enterprise's administrative and operational maneuvers were entirely driven by retaliatory animus, executed in severe bad faith, and accelerated under tight temporal proximity to her statutory leave utilization.

THREE HUNDRED TWENTY-FIFTH The co-employment enterprise's systematic violations of the FMLA were willful, intentional, malicious, and executed with reckless disregard for Plaintiff's federally protected civil rights, thereby triggering the extended three-year statute of limitations under 29 U.S.C. § 2617(c)(2).

THREE HUNDRED TWENTY-SIXTH As a direct and proximate result of the co-employment enterprise's willful FMLA violations, Plaintiff has suffered and continues to suffer significant economic damages, severe loss of earnings, retroactive deprivation of medical benefits, career destruction, and profound emotional and psychological distress.

**SECOND CAUSE OF ACTION**
**(<u>Whistleblower Retaliation -New York Labor Law § 740</u>)**

THREE HUNDRED TWENTY-SEVENTH Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

THREE HUNDRED TWENTY-EIGHTH At all relevant times, Defendant StaffCo, operating as an integrated administrative co-employer within a centralized joint-employment relationship alongside operational hospital executives, acted as an employer of Plaintiff within the meaning, definitions, and protections of New York Labor Law § 740.

THREE HUNDRED TWENTY-NINTH Plaintiff engaged in high-priority protected whistleblower activity under NYLL § 740 by factually reporting and disclosing to supervisors, administrators, and external regulatory bodies ongoing operational activities, policy violations, and systemic failures within the clinical workplace that represented an affirmative defiance of mandatory public health laws, medical protocols, and institutional safety regulations, thereby creating a clear, substantial, and specific danger to public health and patient safety.

THREE HUNDRED THIRTIETH Specifically, Plaintiff's protected whistleblower disclosures directly targeted life-threatening institutional failures, including the unmitigated recovery of an illicit weapon (the shank) on the behavioral health unit, the reckless exposure of clinical staff and vulnerable patients to un-isolated airborne infectious disease pathogens (RSV), and the catastrophic breakdown of the hospital's localized emergency code life-safety infrastructure.

THREE HUNDRED THIRTY-FIRST In direct response to and in retaliation for these protected whistleblower disclosures, the co-employment enterprise executed severe, adverse "retaliatory personnel actions" within the meaning of NYLL § 740 against Plaintiff, including placing her on a manufactured disciplinary suspension, punitively and retroactively terminating her vital healthcare benefits, unlawfully withholding her earned PTO wages, and summarily discharging her from her employment.

THREE HUNDRED THIRTY-SECOND The co-employment enterprise's adverse personnel actions against Plaintiff were carried out in bad faith, with direct retaliatory animus, and in flagrant violation of the anti-retaliation mandates set forth in NYLL § 740(2).

THREE HUNDRED THIRTY-THIRD As a direct and proximate result of the co-employment enterprise's violations of NYLL § 740, Plaintiff has sustained substantial economic

loss, severe deprivation of earnings and medical benefits, loss of professional standing, career destruction, and profound emotional and psychological harm.

## THIRD CAUSE OF ACTION
## (Healthcare Whistleblower Retaliation - New York Labor Law § 741)

THREE HUNDRED THIRTY-FOURTH Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

THREE HUNDRED THIRTY-FIFTH At all relevant times, Plaintiff was an "employee" performing healthcare services, and Defendant StaffCo, operating as an integrated administrative co-employer within a centralized joint-employment relationship alongside operational hospital executives, was an "employer" of Plaintiff within the meaning, definitions, and protections of New York Labor Law § 741.

THREE HUNDRED THIRTY-SIXTH Plaintiff engaged in high-priority protected activity under NYLL § 741 by disclosing and objecting to policies, practices, and activities on the treatment floor that Plaintiff, in good faith, believed and factually documented constituted an improper quality of patient care and a severe enforcement hazard creating a significant risk to patient and public health.

THREE HUNDRED THIRTY-SEVENTH Specifically, Plaintiff's protected disclosures directly opposed egregious patient care breakdowns, including the reckless, bad-faith administrative cancellation of an authorized, medically necessary procedure for a vulnerable pregnant patient suffering from acute chemical addiction, management's dangerous directive to prematurely discharge that un-stabilized pregnant patient to a sober house, and the systemic administrative failure to enforce behavioral accountability protocols on the unit, which left acute psychiatric patients completely un-stabilized and deprived of mandatory therapeutic clinical treatment.

THREE HUNDRED THIRTY-EIGHTH In direct response to and in retaliation for these protected clinical safety objections, the co-employment enterprise executed severe adverse actions against Plaintiff, including placing her on a manufactured disciplinary suspension, punitively and retroactively terminating her vital healthcare benefits, unlawfully withholding her earned PTO wages, and summarily discharging her from her employment.

THREE HUNDRED THIRTY-NINTH The co-employment enterprise's retaliatory personnel actions against Plaintiff directly violate NYLL § 741(2), which strictly prohibits retaliating against a healthcare employee who blows the whistle on improper patient care conditions and regulatory non-compliance.

THREE HUNDRED FORTIETH As a direct and proximate result of the co-employment enterprise's violation of NYLL § 741, Plaintiff has sustained massive financial damages, retroactive deprivation of healthcare benefits, permanent career disruption, loss of professional standing, and severe mental and emotional anguish.

**FOURTH CAUSE OF ACTION**
**(Disability Discrimination: Retaliatory Aggravation of an Impairment NYSHRL**
**NYEL § 296(1)(a)))**

THREE HUNDRED FORTY-FIRST Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

THREE HUNDRED FORTY-SECOND At all relevant times, Plaintiff suffered from clinically documented psychological impairments—specifically, severe psychological trauma and medical distress violently re-opened and re-triggered by the hostile work environment—which conditions legally constitute a "disability" within the meaning and definitions of N.Y. Executive Law § 292(21).

THREE HUNDRED FORTY-THIRD Defendant StaffCo, operating as an integrated administrative co-employer within a centralized joint-employment relationship, possessed actual and continuous notice of Plaintiff's severe medical disability and the profound psychological injuries being actively inflicted upon her by its supervisors on the clinical unit.

THREE HUNDRED FORTY-FOURTH Plaintiff was fully capable of performing the essential functions of her employment, as explicitly demonstrated by her unblemished clinical performance and the receipt of official institutional awards recognizing her professional excellence.

THREE HUNDRED FORTY-FIFTH In direct violation of N.Y. Executive Law § 296(1)(a), the co-employment enterprise actively discriminated against Plaintiff by treating her severe psychological distress with deliberate indifference, exploiting her clinical vulnerability, and using her protected medical impairments as a direct motivating factor to execute severe adverse employment actions against her, including a punitive disciplinary suspension, the retroactive deprivation of her healthcare benefits, and the summary termination of her employment.

THREE HUNDRED FORTY-SIXTH As a direct and proximate result of the co-employment enterprise's discriminatory acts under the NYSHRL, Plaintiff has suffered severe financial harm, retroactive loss of health benefits, loss of professional standing, profound emotional distress, and severe mental anguish.

**FIFTH CAUSE OF ACTION**
**(Disability Retaliation — NYSHRL N.Y. Exec. Law § 296(7))**

THREE HUNDRED FORTY-SEVENTH Plaintiff repeats, reiterates, and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

THREE HUNDRED FORTY-EIGHTH Plaintiff engaged in formal protected activity under the NYSHRL by explicitly notifying management and Human Resources that the severe, unmitigated retaliatory harassment on the unit was actively destroying her health and forcing her to return to intensive, full-time clinical therapy to treat her severe mental health wounds.

THREE HUNDRED FORTY-NINTH In direct response to and in retaliation for Plaintiff opposing disability-related targeting and notifying management of her severe psychological distress, the co-employment enterprise executed severe adverse actions against her, including placing her on a manufactured suspension, retroactively cutting off her health insurance, and terminating her.

THREE HUNDRED FIFTY The co-employment enterprise's punitive actions violate NYEL § 296(7), which strictly prohibits retaliating against any individual because they have opposed unlawful discriminatory practices or filed disclosures regarding a protected disability.

THREE HUNDRED FIFTY-FIRST As a direct and proximate result of the co-employment enterprise's retaliatory acts under the NYSHRL, Plaintiff has sustained substantial economic loss, loss of career earnings, and severe emotional and psychological harm.

**SIXTH CAUSE OF ACTION**
**(Race Discrimination: Disparate Treatment — NYSHRL N.Y. Exec. Law § 296(1)(a))**

THREE HUNDRED FIFTY-SECOND Plaintiff repeats, reiterates, and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

THREE HUNDRED FIFTY-THIRD Plaintiff is a White female and is protected against race-based disparate treatment and selective enforcement under the broad statutory protections of the New York State Human Rights Law.

THREE HUNDRED FIFTY-FOURTH The co-employment enterprise subjected Plaintiff to a harsher, non-uniform disciplinary standard than similarly situated employees of a different racial class, explicitly using a completely harmless, benign text message regarding empty recycling cans to execute a severe suspension and termination.

THREE HUNDRED FIFTY-FIFTH Specifically, the enterprise treated objective non-white comparators vastly more leniently—merely reassigning a Black female nurse who had actively threatened a patient on the unit rather than placing her on an unpaid administrative suspension—thereby conclusively demonstrating that the enterprise applied a harsher, selective disciplinary framework against Plaintiff.

THREE HUNDRED FIFTY-SIXTH: The co-employment enterprise's non-uniform enforcement, disparate treatment, and summary discharge of Plaintiff were driven by improper race-conscious administrative practices, constituting a flagrant violation of N.Y. Executive Law § 296(1)(a).

THREE HUNDRED FIFTY-SEVENTH As a direct and proximate result of the co-employment enterprise's discriminatory acts, Plaintiff has sustained massive financial damages, permanent career disruption, and profound mental and emotional anguish.

## SEVENTH CAUSE OF ACTION
## (Race-Based Hostile Work Environment — NYSHRL N.Y. Exec. Law § 296(1)(a))

THREE HUNDRED FIFTY-EIGHTH Plaintiff repeats, reiterates, and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

THREE HUNDRED FIFTY-NINTH Throughout her tenure, the co-employment enterprise, by and through its operational supervisors, subjected Plaintiff to a continuous,

pervasive, and severe pattern of race-conscious hostility, systematic administrative ambushes, and demeaning professional surveillance.

THREE HUNDRED SIXTY This abusive framework included Director Jackowski subjecting Plaintiff to targeted hostility, physically cornering her inside a clinical day room, and screaming false insubordination metrics in front of professional staff, while management rewarded an unqualified employee with a discriminatory promotion to act as an administrative spy against Plaintiff.

THREE HUNDRED SIXTY-FIRST Under the liberal pleading standards of the NYEL this toxic environment rose far above the level of petty slights or trivial inconveniences, constituting an objectively severe and pervasive hostile work environment that directly destroyed Plaintiff's mental health and impaired her ability to perform her duties.

THREE HUNDRED SIXTY-SECOND As a direct and proximate result of the co-employment enterprise's maintenance of a hostile work environment under the NYSHRL, Plaintiff has sustained severe career harm, extensive loss of benefits, and profound psychological trauma.

**EIGHTH CAUSE OF ACTION**
**(Gender Discrimination: Disparate Treatment — NYSHRL N.Y. Exec. Law § 296(1)(a))**

THREE HUNDRED SIXTY-THIRD Plaintiff repeats, reiterates, and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

THREE HUNDRED SIXTY-FOURTH Plaintiff is a female and is protected against gender-based disparate treatment and selective enforcement under the broad statutory protections of the New York State Human Rights Law.

THREE HUNDRED SIXTY-FIFTH The co-employment enterprise subjected Plaintiff to a harsher, non-uniform disciplinary standard than a similarly situated employee outside of her protected gender class, explicitly utilizing a completely harmless, benign text message regarding empty recycling cans to execute an immediate unpaid suspension and summary termination.

THREE HUNDRED SIXTY-SIXTH Specifically, the enterprise treated an objective male comparator vastly more leniently, merely transferring a male Certified Nursing Assistant ("CNA") who had been accused of performing highly inappropriate body searches and committing severe HIPAA violations to an alternative unit rather than subjecting him to an unpaid administrative suspension or termination—thereby conclusively demonstrating that the enterprise applied a harsher, non-uniform disciplinary standard to female employees.

THREE HUNDRED SIXTY-SEVENTH The co-employment enterprise's selective enforcement, disparate treatment, and summary discharge of Plaintiff were driven by improper gender-conscious administrative practices, constituting a flagrant violation of N.Y. Executive Law § 296(1)(a).

THREE HUNDRED SIXTY-EIGHTH As a direct and proximate result of the co-employment enterprise's discriminatory acts, Plaintiff has sustained massive financial damages, permanent career disruption, retroactive deprivation of medical benefits, and profound mental and emotional anguish.

## ELEVENTH CAUSE OF ACTION
**(Gender-Based Opposition Retaliation — NYSHRL N.Y. Exec. Law § 296(7))**

THREE HUNDRED SIXTY-NINTH Plaintiff repeats, reiterates, and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

THREE HUNDRED SEVENTY Plaintiff repeatedly engaged in formal protected activity under the NYSHRL by submitting written and oral compliance disclosures to Labor Relations Director Libertelli and human resources executives, explicitly opposing the enterprise's discriminatory and disparate disciplinary practices regarding gender and challenging the selective enforcement of facility rules.

THREE HUNDRED SEVENTY-FIRST In direct violation of N.Y. Executive Law § 296(7), the co-employment enterprise responded in direct retaliation for her opposition to gender-based disparate treatment by maintaining her punitive unpaid suspension, retroactively terminating her vital health insurance benefits, and executing her summary discharge a mere seven (7) days after her final compliance meeting.

THREE HUNDRED SEVENTY-SECOND A direct causal connection exists between Plaintiff's protected opposition to gender discrimination and her ultimate discharge, as her civil rights advocacy was the "but-for" motivating cause of the enterprise's adverse actions, and the stated reasons for her termination were entirely unworthy of belief, legally implausible, and manufactured as a pretextual artifice designed to mask unlawful retaliation.

THREE HUNDRED SEVENTY-THIRD As a direct and proximate result of the co-employment enterprise's retaliatory acts under the NYSHRL, Plaintiff has sustained massive financial losses, permanent loss of professional standing, and severe emotional and psychological harm.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant StaffCo, operating as an administrative co-employer within a centralized joint-employment relationship, granting the following forms of relief:

1. Declaratory Judgment: Adjudging and declaring that the practices, administrative maneuvers, and disciplinary actions executed by the co-employment enterprise against Plaintiff violate the Family and Medical Leave Act (FMLA), Title VII of the Civil Rights Act of 1964, New York Labor Law §§ 740 and 741, and New York Executive Law § 296 (New York State Human Rights Law);
2. Back Pay and Benefits: Awarding Plaintiff full back pay, past earnings, deferred compensation, and the cash value of all employment benefits (including the retroactive value of withheld healthcare coverage) unlawfully denied to her from the date of her retaliatory suspension and termination up to the date of judgment, plus pre-judgment interest;
3. Front Pay and Future Earnings: Awarding Plaintiff front pay, future earnings, and prospective compensation to remedy the permanent career disruption and loss of professional standing proximately caused by the enterprise's unlawful and bad-faith discharge;
4. FMLA Liquidated Damages: Awarding Plaintiff an additional amount equal to the sum of her back pay, lost benefits, and interest as liquidated damages pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii), based upon the co-employment enterprise's willful and reckless disregard for her federally protected family and medical leave rights;
5. NYLL Statutory Liquidated Damages: Awarding Plaintiff statutory liquidated damages, civil penalties, and all available financial assessments pursuant to New York Labor Law § 740(5) and § 741;
6. Compensatory and Emotional Distress Damages: Awarding Plaintiff compensatory damages for the severe emotional distress, profound psychological trauma, physical

medical exacerbation, humiliation, and mental anguish intentionally inflicted upon her by the enterprise's discriminatory and retaliatory misconduct;

7. Punitive and Exemplary Damages: Awarding Plaintiff punitive and exemplary damages under Title VII and the New York State Human Rights Law (N.Y. Exec. Law § 296) to punish Defendant for its willful, malicious, and high-handed administrative actions, and to deter the enterprise from engaging in similar bad-faith suppression of civil rights and whistleblower disclosures in the future;
8. Reasonable Attorney's Fees and Costs and
9. Granting Plaintiff such other, further, alternative, or equitable relief as this Court deems just, proper, and necessary under the circumstances.

**JURY DEMAND**

Plaintiff hereby respectfully demands a trial by jury on all counts, claims, issues, and causes of action in this matter that are triable of right by a jury.

Dated: Islandia, New York
October 13, 2026

SCOTT MICHAEL MISHKIN, P.C.

By: Scott Michael Mishkin, Esq.
One Suffolk Square, Suite 240
Islandia, New York 11749
Tel: (631)-234-1154
Fax: (631)-234-5048
*Attorneys For Plaintiff*